UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENDON S. ALBERS and CHRISTOPHER ESTES, | ) ) ) | CR. 06-4242-KES |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR |
| MELLEGARD, INC., a South Dakota corporation, d/b/a Tri-State Implement, Inc.; STEVE MELLEGARD, individually; and STAN MELLEGARD, individually, | ) ) ) ) ) ) ) | PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) | |

Pending before the court are plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment. Both motions are opposed. For the reasons discussed below, plaintiffs' motion for partial summary judgment is granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part.

**FACTUAL BACKGROUND**

Plaintiffs Brendon Albers (Albers) and Christopher Estes (Estes), members of American Indian tribes, have sued their former employer, defendant Mellegard, Inc., d/b/a Tri-State Implement, Inc. and Mellegard's sole shareholders, defendants Steve Mellegard (Steve) and Stan Mellegard

(Stan), for racial discrimination in violation of 42 U.S.C. § 1981, wrongful denial of access to the company health insurance plan in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, and failure to pay overtime wages in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219.  Defendants' counterclaim alleges that plaintiffs unlawfully converted defendants' property and cash monies and that Albers owes money on a loan extended by Mellegard, Inc.

Defendants move for summary judgment on plaintiffs' § 1981, ERISA, and FLSA claims.  Plaintiffs move for partial summary judgment on defendants' conversion counterclaims.[1]

### *Defendants*

Mellegard, Inc., d/b/a Tri-State Implement (Tri-State) is a farm equipment dealership that sells, services, and provides parts for farm equipment.  Plaintiff's Statement of Disputed Material Facts (PSDMF)(Docket 65) ¶ 2.  Steve and Stan are the officers, directors, and shareholders of

---

[1]There is some confusion over whether plaintiffs moved for partial summary judgment on the claim that Albers owes defendants money on an outstanding loan.  See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment (Docket 50) at 2 ("This last Counterclaim is included in this Motion.").  The text of plaintiffs' motion for partial summary judgment, however, is silent as to this counterclaim, and plaintiffs' memorandum in support addresses only the conversion of moneys and property claims.  Therefore, the court will treat plaintiffs' motion as seeking partial summary judgment on the conversion counterclaims only.

Mellegard, Inc.  Defendants' Response to Plaintiffs' Statement of Material Facts (DRPSMF) (Docket 48), ¶ 2.  Both are involved with the day-to-day operations of Tri-State.  PSDMF ¶ 6.  Loxie Murra (Murra), Tri-State's bookkeeper, handles administrative matters such as payroll and managing employee benefits.  PSDMF ¶ 8.

Regular working hours at Tri-State vary by the season.  The shop is open 40 hours per week in the winter and 44 ½ hours per week in the summer.  Deposition of Steve Mellegard (Docket 66-3) at 32; Deposition of Stan Mellegard (Docket 66-4) at 29-30.  The summer hours begin around May 15 and end around November 15.  Deposition of Stan Mellegard at 29-30.  Employees are generally advised that working hours are 7:30 a.m. through 5:30 p.m.  Deposition of Stan Mellegard at 72; Deposition of Loxie Murra (Docket 66-5) at 17.  Tri-State keeps track of employee hours with a time clock and punch card system.  Defendants' Statement of Undisputed, Material Facts in Support of Motion for Summary Judgment (DSUMF) (Docket 53), ¶ 27.  Defendants contend that one employee often punches everyone in when the workday begins and that employees often clock each other out at the end of the workday.  DSUMF ¶ 27.  Plaintiffs argue that co-workers only punch each other in and out if they are all in the facility.  PSDMF ¶ 27.

Tri-State does not pay its employees overtime wages.  See PSDMF ¶ 10. At some point after Albers began working for Tri-State, Murra claims she contacted the South Dakota Department of Labor (South Dakota DOL) to ask whether Tri-State was required to pay overtime wages.  PSDMF ¶ 9.  The South Dakota DOL informed Murra that Tri-State was not required to do so because overtime pay was a benefit like a holiday.  PSDMF ¶ 9.  Neither Steve nor Stan ever contacted the South Dakota DOL to look into the issue. See PSDMF ¶ 9.

Tri-State's employee benefits program is unwritten and unclear.  Tri-State only provides health insurance (or a monthly cash stipend in lieu of such insurance) to employees who work on a full-time or permanent basis. DSUMF ¶ 16.  Employees are eligible for health insurance sixty days after attaining full-time employment status.  Deposition of Steve Mellegard at 34. The position of head painter, held by Albers beginning in June 2003, is considered a permanent position for which benefits are available.  DSUMF ¶ 15.  Tri-State contends that the position of assistant to the head painter, held by both Albers and Estes when they began working for Tri-State, is considered to be a temporary position for which benefits like health insurance are not available.  DSUMF ¶ 17.  But Murra testified that the employee who took over Estes' position as assistant to the head painter

4

receives health insurance benefits.  PSDMF ¶ 17; Deposition of Loxie Murra at 15-16.

In addition to providing health insurance to some employees, Tri-State provides a retirement plan program.  PSDMF ¶¶ 23, 25.  Under this program, an outside representative comes to Tri-State, gives a presentation to the employees, and provides brochures on the plan.  PSDMF ¶ 25.  Other correspondence about retirement plan benefits go directly to employees' homes.  PSDMF ¶ 26.

### Plaintiff Brendon Albers

Albers, who is a member of an American Indian tribe located in South Dakota, began working at Tri-State in January 2002.  PSDMF ¶ 11.  Albers was originally hired as a part-time laborer, but quickly began working full-time.  PSDMF ¶ 14.  Albers was promoted to head painter in June 2003. PSDMF ¶ 18.  The parties dispute the type of work Albers did in the position of head painter.  Albers describes his duties as coordinating the paint department's work and doing some body work.  PSDMF ¶ 19.  Defendants argue that Albers did mechanical work such as electrical work, tire work, slide wheels, and machinery set-up.  DSUMF ¶ 19.

Albers did not receive health insurance benefits until he was promoted to head painter.  PSDMF ¶ 20.  Steve testified that Albers did not receive health insurance prior to his promotion because Steve believed he was

ineligible.  DSUMF ¶ 15.  Steve also testified that he believed that Albers had

health insurance through Indian Health Services.  PSDMF ¶ 15.  Albers often

worked more than 40 hours per week, but never received overtime pay while

working at Tri-State.  Deposition of Brendan Albers (Docket 54-4) at 91.

Throughout his employment at Tri-State, Albers frequently received

advances on his pay.  PSDMF ¶ 85.  Murra kept track of the amounts Albers

received as advances and the amounts he had repaid.  PSDMF ¶ 85.  In one

instance, Steve authorized an advance of $3,300 for Albers to attend an

alcohol treatment program.  PSDMF ¶¶ 86-87.

### Plaintiff Christopher Estes

Estes, who also is a member of an American Indian tribe located in

South Dakota, began working at Tri-State in July 2005.  PSDMF ¶¶ 4, 32.  In

the position of assistant to the head painter, Estes washed skid loaders,

changed tires, sanded, and sandblasted.  PSDMF ¶¶ 33-34.  Estes never

received health insurance benefits during his time at Tri-State.  See PSDMF

¶ 92.  He believed he was entitled to this benefit because he worked full time.

PSDMF ¶ 92.  Steve testified that he believed that Estes received health

insurance through Indian Health Services.  Deposition of Steve Mellegard at

74.  Estes did not request health insurance until August 10, 2006, the day

he quit working at Tri-State.  Deposition of Christopher Estes (Docket 54-5)

at 24-25.  The day before, he had received a letter notifying him that his

6

income exceeded Medicaid eligibility limits, and he decided to ask Stan for health insurance coverage through Tri-State.  Id.

The parties dispute the nature of Estes' employment.  Norman Mellegard, the founder and former owner of Tri-State, testified that he was present at Tri-State when Estes came to work and that he hired Estes on a full-time basis.  PSDMF ¶ 16.  Defendants argue that Estes was hired on a part-time, temporary, as-needed basis.  DSUMF ¶ 16.

The parties also dispute the number of hours Estes typically worked at Tri-State.  Stan testified that he could not identify the number of hours Estes worked on average because employees punched each other in and out, but he believed Estes rarely worked a 40-hour week.  DSUMF ¶¶ 116-117.  Estes disputes defendants' insinuation that he worked fewer hours than are recorded on his time cards and believes that he regularly worked over 40 hours per week.  PSDMF ¶¶ 116-117.  Defendants admit that Estes occasionally worked over 40 hours per week.  Deposition of Stan Mellegard at 51-52; Deposition of Steve Mellegard at 45-46.

Throughout Estes' employment at Tri-State, defendants allowed him to buy gas for his personal use at the station across the street from Tri-State and charge the gas to the Tri-State account.  PSDMF ¶ 96.  The parties characterize this arrangement as an "accommodation" to Estes.  PSDMF ¶ 96.  The terms of the arrangement, however, are disputed.  Estes asserts

7

that the cost of the gas was deducted from his paycheck or was part of his salary.  DRPSMF ¶7.  Stan testified that the price of the gas was not deducted from Estes' paycheck.  DRPSMF ¶ 7.  Defendants also assert that Stan told Estes that he could no longer charge gas to Tri-State's account several weeks before Estes resigned on August 10, 2006.  DRPSMF ¶ 7.

### *Alleged Racial Discrimination*

Both Albers and Estes allege that Steve and Stan made racially offensive comments to them.  PSDMF ¶ 35.  With respect to Steve, plaintiffs argue that he asked both of them whether their mothers had any white children.  PSDMF ¶ 37.  Steve admits that he might have asked Albers whether his mother had any smart kids.  PSDMF ¶ 37.  Albers also claims that Steve asked him whether he was having a vision.  PSDMF ¶ 39.  Although the frequency of Steve's race-based comments is unclear, Albers characterized Steve's comments as sporadic and not as offensive as those made by Stan.  PSDMF ¶¶ 38, 43.  Estes alleges that Steve asked whether his mother had any white children approximately once every two weeks.  PSDMF ¶ 64.

Stan also made race-based comments to both Albers and Estes.  PSDMF ¶¶ 44, 66.  Stan called plaintiffs things like "squaw humper," "prairie nigger," and "wagon burner."  PSDMF ¶¶ 45, 66.  Albers testified that he also

heard Stan say "spear chucker" and "yip yip."  PSDMF ¶ 45.  According to
Albers, Stan made such comments at least once a week.  PSDMF ¶ 46.

      The Tri-State working environment involved a lot of swear words,
profanity, and comments about race made in jest.  PSDMF ¶¶ 55, 57, 59, 60.
Albers admits to using the term "prairie nigger" to describe himself and feels
that it is acceptable for Native Americans to call themselves or one another
"prairie niggers."  PSDMF ¶¶ 47-51.

      The parties disagree over whether plaintiffs asked defendants to stop
making the race-based comments.  See DSUMF ¶¶ 53, 56, 68-69; PSDMF ¶¶
53, 68, 69.  Albers asserts that he expressed his discomfort by rolling his
eyes, making faces, and telling Stan and Steve, "this sucks."  PSDMF ¶ 53.
Similarly, Estes testified that he told Stan to be quiet or shut up when Stan
made racially offensive comments.  PSDMF ¶ 68.  Estes did not talk to Steve
about Stan's comments because he believed Steve would just laugh.  PSDMF
¶ 69.

### *Voluntary Termination of Employment and Related Events*

      Albers and Estes quit working at Tri-State on or about August 10,
2006.  PSDMF ¶ 72.  Both quit mid-morning after discussions with Stan and
Steve about Estes' eligibility for health insurance.  The day after learning that
he was ineligible for Medicaid, Estes approached Stan to ask about benefits,
and Stan threw up his hands, walked into his office, and told Estes that Tri-

State hired him where he was and that he was not entitled to benefits.
PSDMF ¶¶ 97-98.  Estes told Stan that he quit.  PSDMF ¶ 100.  Estes
testified, "So I said, fine, and I walked out.  And it was break time.  And I just
said I quit."  Deposition of Christopher Estes at 52.  Estes never talked to
Steve about health insurance.  PDSMF ¶ 101.

After Estes informed Albers that he quit because Tri-State would not
give him health insurance, Albers approached Steve to discuss the issue, and
the two engaged in a heated discussion.  PSDMF ¶¶ 72,74, 78.  During this
discussion, Albers did not complain to Steve about the race-based
statements and name-calling, but rather that Estes was quitting because he
could not get health insurance.  Albers was upset that he would be losing his
assistant.  PSDMF ¶ 76.  He informed Steve that he was quitting.

After telling Steve and Stan, respectively, that they quit, Albers and
Estes left Tri-State together in Estes' car.  PSDMF ¶ 79.  Estes drove to the
gas station across the street, put gas into his car, and charged Tri-State's
account for the $42.02 purchase price.  PSDMF ¶ 102, Affidavit of Ryland
Deinert, Exhibit 6 (Docket 49-6).  Estes contends that the price of the gas
was deducted from his last paycheck, which covered all but $0.65 of the
price of the gas and Estes' other debts to Tri-State.  Plaintiffs' Statement of
Undisputed Material Facts (PSUMF) (Docket 48) ¶ 9.  Defendants argue that
Estes still owes Tri-State for the price of the gas.  DRPSMF ¶ 9.  Murra does

10

not remember whether Estes' last paycheck was withheld to cover both his monthly child support obligation and the gas purchase or just the child support payment.  Deposition of Loxie Murra (Docket 49-3) at 22-26.  Estes' last paycheck would have been $161.50, but Tri-State records indicated that Estes owed them $162.15.  Id. at 24.  Murra agrees that it appears that Estes reimbursed Tri-State for the price of the gas and that the deductions from Estes' last paycheck "probably included the gasoline."  Id. at 24, 26. Estes did not charge gas to Tri-State's account after August 10, 2006. DRPSMF ¶ 9.

Defendants allege that Albers and Estes converted supplies from Tri-State after quitting their employment.  The supplies Albers and Estes used while working at Tri-State were gone when the new hire began working. DRPSMF ¶ 10.  Steve listed the missing supplies as "DA sanders, . . . masking tape, sandpapers, . . . painting supplies, . . . that type of stuff." Deposition of Steve Mellegard (Docket 49-4) at 62.  Defendants do not have direct knowledge of who took the missing equipment and supplies, plaintiffs deny taking it, and there are no witnesses to the disappearance of the equipment and supplies.  DRPSMF ¶¶ 10-15.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id.</u>

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. <u>Vette Co. v. Aetna Cas. & Sur. Co.</u>, 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. <u>Forrest v. Kraft Foods, Inc.</u>, 285 F.3d 688, 691 (8th Cir. 2002).

12

**DISCUSSION**

I.    **Defendants' Motion for Summary Judgment**

   A.    **42 U.S.C. § 1981**

   Plaintiffs bring race discrimination claims against defendants pursuant to 42 U.S.C. § 1981.  They argue that they were wrongfully denied health insurance benefits on the basis of race and that they were constructively discharged.  Defendants move for summary judgment on the issues of their liability under § 1981 and the availability of punitive damages.  "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." Arnold v. Nursing & Rehab. Center at Good Shepherd, L.L.C., 471 F.3d 843, 845-46 (8th Cir. 2006) (quoting Whitley v. Peer Review Sys., 221 F.3d 1053, 1055 (8th Cir. 2000)).

   1.    **Denial of Health Insurance Benefits**

   Section 1981 establishes the right to make and enforce contracts regardless of race.  42 U.S.C. § 1981(a).  " '[M]ake and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  In the employment context, "Title VII and § 1981 set forth parallel, substantively identical, legal

13

theories of recovery in cases alleging intentional discrimination . . . on the basis of race." Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997). Race discrimination claims under § 1981 and Title VII have the same elements, and should be analyzed the same. Id.

To prevail on their claim that defendants denied them health insurance benefits because of their race, plaintiffs must demonstrate intentional discrimination. King v. Hardesty, 517 F.3d 1049, 1057 (8th Cir. 2008). They can show intentional discrimination by direct or indirect evidence. Id. "When relying on direct evidence . . . the plaintiff must provide evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated[] the adverse employment action." Id. (internal quotation omitted). That is, the plaintiff must provide direct evidence of "conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." Id. at 1057-58 (quoting Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045-46 (8th Cir. 2005)). Direct evidence of discrimination does not include "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process itself." Id.

14

at 1058 (quoting <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277, 109 S. Ct. 1775, 104 L. Ed. 2d (1989) (O'Connor, J., concurring)).

For example, in <u>King</u>, a decisionmaker's statement that "white people teach black kids . . . better than someone from their own race" was found to be direct evidence that race was a motivating factor in the adverse employment decisions regarding an African-American school employee.  <u>Id.</u> at 1058-59.  In contrast, the decisionmaker's conduct in repeatedly using the word "nigger;" referring to African-American employees as "big black bucks" and "my boys;" referring to African-American students as "slaves," "crack babies," "ghetto kids," and "whores"; commenting to an African-American employee that "once you go black, you never go back;" and telling racial jokes in the office fell into the categories of stray remarks or statements by decisionmakers unrelated to the decisional process.  <u>Id.</u> at 1054, 1058.  The single statement that white teachers are better for black students than black teachers was sufficient for the plaintiff to survive summary judgment on her termination and failure to assign additional hours claims.  <u>Id.</u> at 1059.

If the plaintiff provides direct evidence of discrimination, "the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor."  <u>Id.</u> at 1057 (quoting <u>Kratzer</u>, 398 F.3d at 1046).  "At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful

15

discrimination was **a** motivating factor in the defendant's adverse employment action." Id. at 1058 (emphasis in original).  Issues of additional motives and mixed motives for the employment action are issues for trial, not for summary judgment.  Id. at 1059.

Under the indirect method of proving intentional discrimination, the plaintiff must put forth "a prima facie case of unlawful discrimination through circumstantial evidence under the McDonnell Douglas burden-shifting test, and then rebut[] any proffered nondiscriminatory reasons for the employment decision with sufficient evidence of pretext." Id. (citing Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)).  To establish a prima facie case of discrimination, the plaintiff must show that: "(1) she is a member of a protected class; (2) she met the legitimate expectations of her employer; (3) she suffered an adverse employment action;[2] and (4) similarly situated employees that were not members of the protected class were treated differently." Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005).  "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-

---

[2]An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage.  Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Davis, 421 F.3d at 706.

discriminatory reason for its adverse employment action." Id. (internal quotation omitted).  If the employer meets its burden, the plaintiff must prove that the employer's justification is "merely a pretext for discrimination." Id.

A plaintiff may show pretext by showing that the employer "failed to follow its own policies, . . . treated similarly-situated employees in a disparate manner, [and] . . . made substantial changes over time in its proffered reason for an employment decision." Arnold, 471 F.3d at 847 (internal citations omitted).  Regardless of how the plaintiff proves pretext, he must "demonstrate that a discriminatory animus lies behind the defendants' neutral explanations." Id. (quoting Roxas v. Presentation Coll., 90 F.3d 310, 316 (8th Cir. 1996)).

### a.    Albers

The court will first examine whether Albers presented sufficient evidence to overcome summary judgment under the direct method of proving intentional discrimination.

Defendants did not provide Albers with health insurance benefits from the time he began working at Tri-State in January 2002 until he was promoted to the position of head painter in June 2003.  Although many of Steve's and Stan's comments, including calling Albers "squaw humper," "prairie nigger," "wagon burner," "spearchucker," and "yip yip," constitute

17

stray remarks or statements unrelated to the decisional process, Steve's admission that he believed Albers did not need health insurance because he was covered through Indian Health Services may reveal a discriminatory attitude toward Albers on the basis of his race.  Like in King, 517 F.3d at 1058-59, where the decisionmaker's statement that white people teach black students better than black teachers constituted direct evidence that race was a motivating factor in the decisionmaker's decisions regarding the plaintiff's employment, here Steve's belief that Albers received health insurance through Indian Health Services provides a specific link between Steve's feelings and beliefs regarding Albers' race and his decision to deny Albers health insurance from January 2002 through June 2003.  Because Steve was a decisionmaker, his belief that Albers did not need health insurance benefits through Tri-State because he received coverage through Indian Health Services, provides sufficient direct evidence of intentional discrimination to overcome summary judgment.  See id. at 1059.  Albers has presented evidence that race was at least one motivating factor in defendants' decision to deny health insurance benefits.  At the summary judgment stage, it is irrelevant whether defendants had additional or mixed motives for denying Albers health insurance benefits.  Id. at 1058.  Therefore, Albers has overcome summary judgment on his claim that defendants denied him health insurance on the basis of his race through the direct method.

18

Alternatively, the court next considers whether Albers has presented sufficient evidence to overcome summary judgment under the indirect method of proving intentional discrimination.  Under this method, Albers must put forth a prima facie case of unlawful discrimination and rebut defendants' asserted nondiscriminatory reasons for the denial of health insurance benefits.  Id. at 1057.  Albers has established a prima facie case of race discrimination.  See Davis, 421 F.3d at 704 (setting out prima facie case).  It is undisputed that (1) he is an American Indian, which constitutes a protected class; (2) he met the expectations of defendants; and (3) he was denied health insurance benefits, which constitutes an adverse employment action.  There is a genuine dispute over the fourth element of the prima facie case, whether similarly situated employees who were not American Indian were treated differently.  Defendants allege that the position of assistant to the head painter, held by Albers from January 2002 until June 2003, was a temporary position for which health insurance benefits were not provided. But Albers alleges that the person who took over that position after Estes quit was provided with health insurance.  This disputed fact creates a genuine issue of material fact for trial.

Defendants argue that their policy of providing health insurance benefits to full-time employees after sixty days constitutes a legitimate, non-discriminatory reason for denying Albers this benefit from January 2002 to

19

June 2003.  There is a genuine issue of material fact regarding whether defendants' proffered explanation is "merely a pretext for discrimination." See id.  Albers may show pretext by showing that defendants failed to follow Tri-State's benefits policy or that defendants treated similarly-situated employees differently.  See Arnold, 471 F.3d at 847.  The disputed fact of whether the employee who replaced Estes as assistant to the head painter received health insurance benefits creates a genuine issue of whether defendants followed their purported policy of providing health insurance benefits only to full-time employees (a category which excludes the position of assistant to the head painter) and whether non-American Indian employees in the same position were treated differently.  Moreover, the undisputed facts that Steve often asked Albers if Albers' mother had any white or smart children and that Stan called Albers racist names like "squaw humper," "prairie nigger," and "wagon burner" create a question for the jury of whether discriminatory animus lies behind defendants' race-neutral explanation for denying Albers health insurance benefits.

Because there are genuine issues of material fact under both the direct and indirect methods of proving intentional discrimination, defendants are not entitled to judgment as a matter of law on Albers' claim that he was denied health insurance benefits because of his race.

20

### b.   Estes

Similarly, there are genuine issues of material fact that preclude summary judgment on Estes' wrongful denial of health insurance claim. Estes worked at Tri-State from July 2005 until August 2006 in the position of assistant to the head painter.  He never received health insurance benefits.  Because defendants made the same statements to and about Estes and Albers, and because defendants provided the same justification for denying both plaintiffs health insurance, the analysis of Albers' wrongful denial of benefits claims applies to Estes as well.

Like Albers, Estes presents sufficient evidence to survive summary judgment under both the direct and indirect methods of proving intentional discrimination.  Under the direct method, Steve's testimony that he believed Estes received health insurance coverage through Indian Health Services provides evidence from which a jury could find that race was a motivating factor in defendants' decision to deny Estes health insurance benefits.  This is sufficient for Estes to overcome summary judgment, and defendants' assertion that race-neutral policies also motivated their decision to deny health insurance benefits is an issue for trial.  See King, 517 F.3d at 1058-59.

Morever, under the indirect method of proving intentional discrimination, Estes has shown that there are genuine issues relating to the

21

material facts of whether defendants treated similarly-situated employees differently with respect to health insurance benefits, whether defendants consistently followed their employment policies, and whether discriminatory animus motivated defendants' decision to deny Estes health insurance benefits.  In addition to Estes' assertion that the employee who replaced him received health insurance, Estes argues that he was hired by Steve and Stan's father as a permanent and full-time employee entitled to the full range of benefits provided by Tri-State.  This fact could rebut defendants' proffered race-neutral explanation for denying Estes health insurance benefits.  Based on these disputed facts, defendants have not shown that they are entitled to judgment as a matter of law on Estes' wrongful denial of health insurance claim.

### 2.    Constructive Discharge

Plaintiffs also claim that they were constructively discharged from their employment at Tri-State in that defendants made their working conditions intolerable because of their race.  Plaintiffs specifically allege that they were subject to racial slurs and that Estes was wrongfully denied health insurance on the basis of his race.

"An employee is constructively discharged if an employer renders the employee's working conditions so intolerable that the employee is forced to quit."  Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 910 (8th Cir.

22

2003).  The employee must demonstrate that the employer " 'deliberately creat[ed] intolerable working conditions with the intention of forcing [him] to quit' and that 'a reasonable person in [his] situation would find the working conditions intolerable." Willis v. Henderson, 262 F.3d 801, 809 (8th Cir. 2001) (quoting Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998)).  An employee may demonstrate the employer's intent by showing that "the employee's resignation was reasonably foreseeable as a consequence of his working conditions." Reedy, 333 F.3d at 910.  The employee also must show that the employer knew or should have known about the alleged discrimination and harassment.  "[A]n employee who quits without giving [his] employer a reasonable chance to work out a problem has not been constructively discharged." Davis, 421 F.3d at 706 (quoting Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996)).  Overall, an employee must show more than a Title VII violation in order to prove that he has been constructively discharged.  Willis, 262 F.3d at 810.

As an example of the higher standard for a constructive discharge claim compared to other race discrimination claims, the Eighth Circuit granted summary judgment on an employee's constructive discharge claim while it denied summary judgment on a hostile work environment claim based on the same facts.  Reedy, 333 F.3d 906.  In Reedy, the employee experienced racial harassment from other employees.  In one instance a co-

23

worker failed to produce food the plaintiff had ordered, and said, "Fucking nigger, go your own self the next time." Id. at 908.  The plaintiff also witnessed co-workers harass another black employee by exclaiming "all you niggers steal" and throwing a metal blade at the employee.  Id.  Graffiti also appeared in a bathroom stall with the word "coon" written under the plaintiff's name and the phrase "all niggers must die" under a drawing of an ape.  Id.  That graffiti was soon painted over, but the phrase "kill all niggers" and the plaintiff's name appeared in the bathroom stall, and plaintiff's supervisor refused to remove the graffiti.  Id.  The court found that the frequency, longevity, and physically threatening nature of the harassment provided sufficient evidence to make out a submissible case on the plaintiff's hostile work environment claim.  Id. at 910.

The court reasoned, however, that the plaintiff failed to make out a claim for constructive discharge.  Id.  Although the racial harassment was sufficiently severe and pervasive for a hostile work environment claim, the plaintiff "failed to present sufficient evidence for a jury to find that a reasonable person in Mr. Reedy's position would have found the conditions of his employment so intolerable that he would be forced to quit."  Id.

### a.    Albers

Albers had health insurance when he resigned.  As a result, the only intolerable working condition that affected him was the alleged racial

harassment by Steve and Stan.  But the undisputed facts show that the intolerable working conditions allegedly created by Steve's and Stan's use of derogatory racial slurs did not force Albers to quit.  Rather, Albers resigned because Tri-State refused to provide health insurance coverage to Estes. Albers did not mention the racial slurs as a reason he was quitting in his heated discussion with Steve, and he has never claimed to have quit because of the racial harassment.  Therefore, Albers has not stated a claim of constructive discharge based on racial discrimination.

Even if Albers quit because of the intolerable working conditions at Tri-State, defendants would still be entitled to summary judgment because Albers has presented insufficient evidence for a jury to find that a reasonable employee in Albers position would be forced to quit.  The racial slurs Albers experienced were not as severe and threatening as those the plaintiff experienced in Reedy.  Steve asked Albers if his mother had any white or smart children and made comments about Albers' "visions."  Stan called Albers "squaw humper," "prairie nigger," and "wagon burner."  Stan also referred to Native Americans as "spear chucker" and "yip yip."  Although the names and phrases used by Steve and Stan were offensive, they do not rise to the level of the personal death threats allowed to remain in bathroom stalls by the supervisors in Reedy.  See 333 F.3d at 910.  Because the more severe and threatening language in Reedy was insufficient to make out a

case of constructive discharge, the racial harassment engaged in by Steve and Stan was also insufficient for a jury to conclude that a reasonable person would have been forced to quit. Therefore, defendants are entitled to summary judgment on Albers' constructive discharge claim.

### b.    Estes

Estes bases his claim of constructive discharge on racial harassment by Steve and Stan and denial of access to the company health insurance program because of his race. For the same reasons that the racial harassment against Albers did not create a submissible case of constructive discharge on his § 1981 claim, the racial harassment against Estes does not create a question of fact for the jury on whether the Mellegards rendered Estes' working conditions so intolerable that he reasonably believed he had to quit. Estes informed Stan that he was quitting because he was refused health insurance, and he did not claim that he quit based on the racial slurs. Further, Steve and Stan used the same derogatory phrases based on Estes' race that they used with Albers. These phrases were less threatening and severe than the language used in Reedy where the employer was entitled to summary judgment on the constructive discharge claim. Viewing the facts in the light most favorable to Estes, Estes has not presented evidence that Tri-State created intolerable working conditions or that a reasonable person in

Estes' position would have found the conditions so intolerable that he had to resign.

Estes also claims that Tri-State denied him access to the company health insurance plan on the basis of his American Indian race.  The court finds that the denial of health insurance under these facts did not create intolerable working conditions.  Estes was hired in July 2005.  He never received health insurance benefits.  In fact, he did not ask for them until August 2006.  He learned the day before that he was no longer eligible for Medicaid, so he approached Stan to ask for benefits.  Stan refused, indicating that Estes was hired "as he was" and was not entitled to health insurance.  During that conversation, Estes announced that he quit.  He never asked Steve, co-owner and manager of Tri-State, for health insurance benefits.

Because Estes quit during the same conversation in which he first asked for health insurance, he has not shown that Tri-State deliberately created intolerable working conditions with the intention to make him quit. Estes cannot show that his resignation was reasonably foreseeable as a result of the refusal to provide him with health insurance because he had worked at Tri-State for over a year without this benefit and without even asking for it.  Moreover, Estes quit without giving Tri-State a reasonable chance to work out the problem.  He did not pursue the matter further with

27

Stan or talk at all with Steve.  When an employee quits rather than working with the employer to resolve his concerns, there is no constructive discharge. Davis, 421 F.3d 706.  Regardless of the reason for the denial of health insurance benefits to Estes, given the facts construed in the light most favorable to Estes, Tri-State's refusal to provide this benefit was not a constructive discharge.  There are no genuine issues of material fact and defendants are entitled to judgment as a matter of law on Estes' constructive discharge claim.

### 3.    Punitive Damages

Defendants also move for summary judgment on the availability of punitive damages for plaintiffs' § 1981 claims.  The court finds that there are genuine issues on the question of whether defendants acted with the requisite mental state in denying Albers and Estes health insurance benefits to support submission of punitive damages to the jury.

A plaintiff may recover punitive damages under § 1981 if the employer discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  Kim, 123 F.3d at 1063, 1065. The malice or reckless indifference standard focuses on the employer's state of mind.  Kolstad v. Am. Dental Assoc., 527 U.S. 526, 534, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999).  "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in

punitive damages." <u>Id.</u> at 536.  A showing of egregious or outrageous conduct may provide evidence of the requisite mental state, but is not necessary to have punitive damages submitted to the jury.  <u>Id.</u>; <u>see also</u> <u>Ross v. Kan. City Power & Light Co.</u>, 293 F.3d 1041, 1048 (8th Cir. 2002).

Here, it is undisputed that Steve believed Albers and Estes did not need health insurance through Tri-State because they were American Indian and were covered by Indian Health Services.  It is also undisputed that Steve and Stan made race-based comments to Albers and Estes, including regularly calling them racially-explicit and offensive names.  Further, Murra testified that the white employee who replaced Estes as assistant to the head painter received health insurance benefits.  Tri-State had an informal policy relating to health insurance and other benefits, but may have failed to follow it with respect to Albers and Estes.  These facts are enough to create a genuine issue as to whether defendants acted with malice or recklessness, i.e., an awareness that their employment decisions might violate federal law, in denying Albers and Estes health insurance benefits.

Defendants argue that the Tri-State workplace involved frequent use of profanity and race-based comments, and that Stan and Steve had a close relationship with Albers and Estes.  These facts go to the egregiousness of defendants' conduct, not to defendants' state of mind in denying health insurance benefits to two American Indian employees.  Because Albers and

29

Estes have shown facts that may support a finding that defendants acted with malice or reckless indifference to their federally protected rights, defendants are not entitled to judgment as a matter of law on the issue of punitive damages.

**B.      ERISA**

Plaintiffs' second cause of action alleges violations of ERISA.  Albers alleges that defendants (1) wrongfully denied him the opportunity to enroll in the company health insurance plan between January 2002 and June 2003 and (2) failed to provide the summary plan description and yearly or quarterly statements associated with the retirement plan.  Albers did not argue his second ground for relief under ERISA in plaintiffs' response to defendants' motion for summary judgment, and as a result the court considers this claim abandoned.  Estes alleges that defendants violated ERISA by wrongfully denying him the opportunity to enroll in the company health insurance plan even after he had worked for sixty days and by wrongfully denying him the opportunity to enroll in the company retirement plan.

**1.      Health Insurance**

ERISA provides a civil cause of action for an ERISA plan participant to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under

30

the terms of the plan." 29 U.S.C. § 1132(a)(1)(A). "The term 'participant' means any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . ." 29 U.S.C. § 1002(7). Former employees qualify as participants only if they " 'have . . . a reasonable expectation of returning to covered employment' or . . . a 'colorable claim' to vested benefits." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 117, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989) (internal citations omitted). "To say[, however,] that a 'participant' is any person who claims to be one begs the question of who is a 'participant' and renders the definition set forth in § 1002(7) superfluous. <u>Id.</u>

Here, is it undisputed that Albers and Estes are no longer employees of Tri-State. As former employees, the only way they can achieve the status of "participants" is if they have a reasonable expectation of returning to covered employment or a colorable claim to vested benefits. <u>Id.</u> at 118. Given the heated discussions that led to plaintiffs' voluntary termination of employment and the allegations in the present lawsuit, plaintiffs do not have a reasonable expectation of returning to employment at Tri-State. <u>See Taylor-Sammons v. Bath</u>, 398 F. Supp. 2d 868, 877 (S.D. Ohio 2005) (finding no reasonable expectation of returning to covered employment where

31

employee was terminated).  Therefore, plaintiffs must have a colorable claim

to vested benefits to qualify as participants under § 1132(a).

     The standard for a colorable claim is low.  A colorable claim is one that

is not without some merit.  Halbach v. Great-West Life & Annuity Ins. Co.,

No. 4:05CV02399-ERW, 2007 WL 1566878, at *5 (E.D. Mo. May 29, 2007).

A claim need not have a likelihood of success on the merits to be colorable.

Id. (citing Abraham v. Exxon Corp., 85 F.3d 1126, 1129 (5th Cir. 1996)).  In

contrast, the requirements for "vested benefit" are more stringent.  A claim

that an employer wrongfully failed to provide health insurance is not a

colorable claim to vested benefits.  Taylor-Sammons, 398 F. Supp. 2d at 877.

There is no vested benefit if the employee was never provided with the

insurance.  See id.; see also Kiesz v. General Parts, Inc., Civ. No. 05-1043,

2007 WL 963489, at *13 (D.S.D. Mar. 28, 2007) (finding that part-time

employee was not a participant because part-time employees were not

eligible to participate in the company benefit plan).  Further, even if a former

employee had actually received health insurance during his employment,

health insurance benefits are not the type of vested retirement or termination

benefits that the Supreme Court envisioned when it articulated the "colorable

claim for vested benefits" standard in Firestone.  Nicholson v. Nat'l Accounts,

Inc., 105 F. Supp. 2d 1290, 1294 (S.D. Ala. 1999); see also Marsh v.

DakotaCare & Peschke Trucking, Inc., No. 01CV4095, 2001 WL 1819336, at *2 (D.S.D. Oct. 27, 2001).

Here, it is undisputed that Albers did not receive the benefit of health insurance between January 2002 and June 2003.  Although Albers argues that he was wrongfully denied health insurance benefits during this period, ERISA does not provide a cause of action because Albers was not a plan participant.  Similarly, it is undisputed that Estes never received health insurance during his employment at Tri-State.  Because Estes is not a plan participant for the purposes of § 1132, his ERISA claim based on denial of health insurance cannot stand.  Defendants are entitled to judgment as a matter of law on Albers' and Estes' ERISA claims.[3]

### 2. Retirement Plan

Estes also argues that defendants violated ERISA by denying him the opportunity to enroll in the company's retirement fund program.  Defendants are entitled to summary judgment on this claim because they are not the proper defendant.

"[T]he proper party against whom a claim for ERISA benefits may be brought 'is the party that controls administration of the plan,' not the plan

---

[3] Because the court finds that defendants are entitled to summary judgment on Albers' ERISA claim, it does not address defendants' alternative argument that Albers is estopped from bringing this claim because he failed to name it in an earlier bankruptcy proceeding.

participant's employer." <u>Hall v. Lhaco, Inc.</u>, 140 F.3d 1190, 1194 (8th Cir.

1998) (quoting <u>Layes v. Mead Corp.</u>, 132 F.3d 1246, 1249 (8th Cir. 1998)).

Here, it is undisputed that Tri-State established a retirement fund and that

an outside representative of the organization running the fund provided

information to employees and maintained all correspondence with the

employees regarding the retirement plan.  Tri-State was not involved with

running the retirement plan program.  Because defendants did not control

the administration of the retirement plan, they are not proper defendants,

and they are entitled to judgment as a matter of law.  Defendants' motion for

summary judgment on the ERISA claims is granted.

### C.    Fair Labor Standards Act

Plaintiffs' final count alleges that defendants violated the FLSA by

failing to provide the statutorily required compensation for overtime hours.

### 1.    Mechanics Exemption

Generally, the FLSA requires employers to pay employees overtime

wages for hours worked in excess of 40 hours per week.  29 U.S.C.

§ 207(a)(1).  But, the FLSA provides for an exemption from the overtime

requirement for "any salesman, partsman, or mechanic primarily engaged in

selling or servicing automobiles, trucks, or farm implements, if he is

employed by a nonmanufacturing establishment primarily engaged in the

business of selling such vehicles or implements to ultimate purchasers."  29

34

U.S.C. § 213(b)(10)(A).  Defendants argue that both Albers and Estes are mechanics falling under this exemption.

Like all FLSA exemptions, the mechanics exemption should be "narrowly construed against the employer asserting [it], and ought to be applied only in those circumstances which plainly and unmistakably come within [its] terms and spirit."  <u>Donovan v. Bereuters, Inc.</u>, 704 F.2d 1034, 1036 (8th Cir. 1983).  "Disputes regarding the nature of an employee's duties are questions of fact, but the ultimate question whether an employee is exempt under the FLSA is an issue of law."  <u>Jarrett v. ERC Props., Inc.</u>, 211 F.3d 1078, 1081 (8th Cir. 2000) (citing <u>Icicle Seafoods, Inc. v. Worthington</u>, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986)).

The parties do not dispute that Tri-State is a nonmanufacturing establishment primarily engaged in the business of selling farm implements to ultimate purchasers.  Therefore, Tri-State is not required to comply with the FLSA's overtime requirements if Albers and Estes are mechanics "primarily engaged in selling or servicing automobiles, trailers, trucks, farm implements, or aircraft."  29 C.F.R. § 779.372(b)(1)(ii).

The FLSA does not define "mechanic," but the relevant regulation provides that "a mechanic is any employee primarily engaged in doing mechanical work (such as get ready mechanics, automotive, truck, farm implement, or aircraft mechanics, used car reconditioning mechanics, and

wrecker mechanics) in the servicing of an automobile, trailer, truck, farm

implement, or aircraft for its use and operation as such."  29 C.F.R.

§ 779.372.  "[E]mployees primarily performing such nonmechanical work as

washing, cleaning, painting, polishing, tire changing, installing seat covers,

dispatching, lubricating, or other nonmechanical work" are not mechanics.

29 C.F.R. § 779.372.

The Eighth Circuit has not addressed the issue of who is a mechanic

for the purposes of the mechanics exemption.  The Fourth Circuit has held

that a used car reconditioner who buffed, painted, and washed used cars;

ensured that they were in running order; and changed batteries when

necessary was not a mechanic under § 213(b)(10).  Brennan v. Bill Kirk's

Volkswagen, 497 F.2d 892, 893-94 (4th Cir. 1974).  The court reasoned, "[the

employee's] appearance reconditioning work, which involves washing,

cleaning, painting, and polishing used cars, and his various porter and

errand duties do not qualify him as a mechanic."  Id. at 894.  Indeed, most of

the employee's duties were specifically listed in the regulation as outside the

work of a mechanic.  Id.

In contrast, the United States District Court for the Middle District of

Florida found that an employee was a mechanic where his job duties

included inspecting and servicing used cars, making repairs to used cars to

place them in salable condition, using hand and power tools to work on cars,

inspecting cars for damage or missing parts, inspecting and correcting misaligned items, testing engine, break, and steering operation, testing power equipment, installing optional equipment, and repairing major mechanical or hydraulic equipment.  Paneto v. Motor Car Concepts II, Inc., No. 606CV-828-ORL-18KRS, 2007 WL 328730, at *1, *3 (M.D. Fla. Jan. 31, 2007).

Based on the definition of mechanic contained in the regulation and the interpretations in Brennan and Paneto,[4] the court finds that, as a matter of law, Estes was not a mechanic within the exemption from the FLSA's overtime provisions.  As an assistant to the head painter, Estes washed skid loaders, changed tires, sanded, and sandblasted.  His tasks fall squarely

---

[4] Defendants rely on a case finding that an employee whose tasks included checking the air conditioning, battery, and steering of new cars; checking and refilling the cars' fluids; checking the interior of the cars; attaching license plates; and driving each car to ensure proper operation, was a mechanic for the purposes of the exemption.  Viart v. Bull Motors, Inc., 149 F. Supp. 2d 1346, 1347-48, 1351 (S.D. Fla. 2001).  The employee did not perform mechanical repairs on the cars.  Id. at 1348.  The court in Viart quoted the definition of "New-Car Get Ready Mechanic" contained in the Department of Labor's Dictionary of Occupational Titles in support of its conclusion that an employee who performed no major repairs on the vehicles was a mechanic.  Id. at 1349-50.  Neither the dictionary nor the regulation cross-reference each other, and there is no indication that the dictionary definition is intended to control the meaning of the phrase "get ready mechanic" in the regulation. Moreover, the Department of Labor's definition includes the following tasks: tuning the engine, installing or repairing major mechanical, hydraulic, or electromechanical equipment, and installing power brakes.  See id. at 1350 (quoting U.S. Dep't of Labor, Dictionary of Occupational Titles § 806.361.026 (4th ed. 1991)).  These tasks are consistent with the interpretation of "mechanic" in the regulation and in Paneto.

within the type of work excluded from the definition of mechanic in the regulation—"nonmechanical work [such] as washing, cleaning, painting, [and] polishing." See 29 C.F.R. § 779.372(c)(3); see also Brennan, 497 F.2d at 894.  Because Estes was not a mechanic, the exemption in § 213(b)(10)(A) does not apply to him.[5]

With respect to Albers while he was in the position of head painter, the court finds that there is a genuine issue of material fact over whether his duties were those of a mechanic.  Albers argues that his duties included coordinating the paint department and doing some body work.  These tasks, the first administrative and the second falling within the same surface-level type of work engaged in by Estes, would not make Albers a mechanic.  On the other hand, defendants argue that Albers performed electrical work, tire work, slide wheels, and machinery set up.  These tasks, if they include engine, brake, or wiring repairs, would qualify as mechanical tasks.  See Paneto, 2007 WL 328730, at * 1, *3.[6]  Although the ultimate question of

---

[5] Albers was not a mechanic within the mechanic's exemption during the period of January 2002 to June 2003, when he held the same assistant to the head painter position that Estes later held.

[6]The court notes that defendants admitted in their answer that "Albers did not work for Tri-State as a mechanic and allege[d] that Albers performed painting and body work on the implements, as well as assisting mechanics in their work on the implements."  Answer and Counterclaim (Docket 11) ¶ 14.  Although defendants' admission "casts its contrary argument to this court in an unpersuasive light," Fox Sports Net North, L.L.C. v. Minn. Twins P'ship, 319 F.3d 329, 335 n.4 (8th Cir. 2003), the court does not find the admission

whether Albers is exempt under the FLSA is an issue of law that can be decided on summary judgment, disputes regarding the nature of an employee's duties are questions of fact.  See Jarrett, 211 F.3d at 1081. There is an underlying dispute over the types of tasks Albers performed as head painter, so defendants are not entitled to summary judgment on the basis of the mechanics exemption.

### 2.    No Overtime Hours

In addition to arguing that plaintiffs are exempt from the FLSA's overtime provisions, defendants argue that plaintiffs are not entitled to damages because they did not actually work any overtime hours.  The court finds that genuine issues of material fact exist as to whether plaintiffs worked more than 40 hours per week, precluding summary judgment on the FLSA claims.

In an action for overtime wages brought under the FLSA, "the burden is upon the plaintiff to establish by a preponderance of the evidence the number of hours worked and the amount of wages due." Johnson v. Dierks Lumber & Coal Co., 130 F.2d 115, 118 (8th Cir. 1942).

The parties dispute whether plaintiffs worked overtime hours at all, and if they did, how many hours.  The only time records the court has before

---

dispositive.  The analysis under the mechanic's exemption does not depend on the employee's job title, but rather on the types of tasks he performed.  There remains a genuine issue of fact on that point.

it are copies of Estes' time cards from January 6, 2006, through August 11, 2006.  These time cards show that Estes worked more than 40 hours at least fourteen weeks during the seven-month period.  Defendants, however, contend that Estes rarely worked a 40-hour week, and that the time cards reflect more hours than he actually worked.  Estes denies that he asked other employees to punch in and out for him.  Viewing the evidence in the light most favorable to Estes, there is a genuine issue of fact as to the number of overtime hours Estes worked.

With respect to Albers, the court does not have before it any time cards or payroll records.  There is still an issue of material fact sufficient to preclude summary judgment against Albers, however, because defendants admit that employees regularly worked 44 ½ hours per week from around May 15 through November 15.  Albers contends that he often worked more than 40 hours per week.  The evidence before the court that, for at least part of the year, Albers worked around 4 ½ hours a week of overtime for which he was not compensated is sufficient to create a genuine issue of material fact as to the existence and amount of uncompensated overtime hours for Albers. See McMillin v. Foodbrands Supply Chain Services, Inc., 272 F. Supp. 2d 1211, 1217 (D. Kan 2003) (denying summary judgment on FLSA claim where plaintiff presented evidence that she worked at least twenty hours overtime of which her supervisors were aware).  Because a genuine issue as to the

40

material fact of the number of overtime hours plaintiffs worked exists,

summary judgment is denied on this ground.

###     3.     Damages

Defendants also move for summary judgment on plaintiffs' eligibility

for liquidated damages on the ground that defendants acted in good faith

because Murra contacted the South Dakota DOL and was advised that Tri-

State did not need to pay its employees overtime.  Any employer who violates

the overtime provisions of the FLSA is liable for the amount of unpaid

overtime compensation, as well as "an additional equal amount as liquidated

damages."  29 U.S.C. § 216(b).  The liquidated damages award is "mandatory

unless the employer can show good faith and reasonable grounds for

believing that it was not in violation of the FLSA."  Braswell v. City of El

Dorado, Ark., 187 F.3d 954, 957 (8th Cir. 1999).  Defendants contend that

Murra contacted the South Dakota DOL and was advised that overtime for

Tri-State employees was optional, like paid holidays.  Merely asserting

reliance on a Department of Labor opinion letter or other advice does not

establish good faith.  See Kautsch v. Premier Commc'ns, No. 06-cv-04035-

NKL, 2008 WL 539324, at *3-4 (W.D. Mo. Feb. 26, 2008) (finding that

employer must investigate whether employees fall into the description of

exempt employees described in opinion letter and that letter received after a

Department of Labor investigation may, but does not automatically, sustain

a defense of good faith reliance).  Because questions of fact exist as to the representations Murra made to the South Dakota DOL regarding the types of employees working for Tri-State and the tasks performed by these employees and the advice given by the South Dakota DOL, summary judgment on the good faith defense is denied.

Defendants also contend that the FLSA imposes a two-year time limitation on the recovery of compensatory damages.  29 U.S.C. § 255(a) limits recovery of overtime wages to the period of two years preceding the filing of suit, unless the violation was a willful one, in which case recovery is limited to the three years preceding the filing of suit.  An employer has acted willfully if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988).

Plaintiffs allege that defendants willfully violated the FLSA's overtime provisions, but neither party addressed the limitations period for a willful violation in its briefs.  Defendants' reliance on a single phone call to the South Dakota DOL to determine whether it was in compliance with the FLSA may support a finding of reckless disregard for the overtime provisions of the FLSA.  Because a question of fact exists regarding the details of the conversation between Murra and the South Dakota DOL, the court cannot

42

determine on summary judgment whether the two-year or three-year statute of limitations applies.

### D.    Individual Defendants

Steve and Stan, as individuals, argue that they are entitled to summary judgment on the § 1981 and ERISA claims because neither statute provides for supervisor liability.  They also assert in a footnote that the FLSA does not allow for supervisors to be held individually liable.  Although defendants are correct that supervisors cannot be held individually liable under ERISA,  Rockney v. Blohorn, 877 F.2d 637, 641 (8th Cir. 1989), their assertion that there is no individual liability under § 1981 or the FLSA is incorrect.  With respect to § 1981, although the Eighth Circuit Court of Appeals has not addressed the issue, numerous district courts and other circuits have found that supervisors can be held individually liable on race discrimination claims brought under § 1981.  See, e.g., Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) ("[A]lthough . . . Title VII claims are not cognizable against individuals, individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts."); Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991) (stating that individual defendant can be liable under § 1981 if she was personally involved in discriminatory conduct), overruled on other grounds by Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1228 (10th Cir. 2000); Al-Khazraji

43

v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986) (finding that
individual directors, officers, and employees of company may be personally
liable if they are personally involved in discrimination or if they authorized,
directed, or participated in the discriminatory conduct); Habben v. City of
Fort Dodge, 472 F. Supp. 2d 1142, 1155-56 (N.D. Iowa 2007).

With respect to the FLSA, "[t]he overwhelming weight of authority is
that a corporate officer with operational control of a corporation's covered
enterprise is an employer along with the corporation, jointly and severally
liable under the FLSA for unpaid wages." Novak v. Mackintosh, 919 F. Supp.
870, 877 (D.S.D. 1996); see also Rockney, 877 F.2d at 643 (8th Cir. 1989)
(reasoning that the FLSA permits suits against employees in their individual
capacities).

More importantly, plaintiffs do not claim that Steve and Stan are liable
as supervisors. Rather, they allege that Steve and Stan should be held
individually liable as shareholders of Mellegard, Inc. under the equitable
doctrine of piercing the corporate veil. Plaintiffs have properly named Steve
and Stan as defendants on their § 1981 and FLSA claims, even though the
question of the corporation's liability is still undecided. See Pinnacle Pizza
Co. v. Little Caesar Enters., Inc., 395 F. Supp. 2d 891, 895 (D.S.D. 2005)
("While there exists a presumption against piercing the corporate veil, a
plaintiff should be given the opportunity to test its claim on the merits as

44

long as the underlying facts or circumstances are a proper subject for relief."). When seeking to hold individual shareholders liable, a plaintiff may file an action naming the corporation and the relevant shareholders as defendants or name only the individual shareholders without naming the corporation. 45 Am. Jur. 3d Proof of Facts § 19 (2008). Here, Steve and Stan were properly named as defendants. Moreover, Steve and Stan have not alleged any undisputed material facts on the issue of piercing the corporate veil that would allow the court to grant summary judgment in their favor.

## II.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment on defendants' conversion counterclaims. Under South Dakota law, "[c]onversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right." Chem-Age Indus. v. Glover, 652 N.W.2d 756, 766 (S.D. 2002). Proof of motive, intent, or purpose to do a wrong is not required to establish conversion. Rensch v. Riddle's Diamonds of Rapid City, Inc., 393 N.W.2d 269, 271 (S.D. 1986). Indeed, "[t]he intention required is simply an intent to use or dispose of the goods, and the knowledge or ignorance of the actor as to their ownership has no influence in deciding the question of conversion." Id. (quoting Watkins v. Layton, 324 P.2d 130, 134 (1958)).

45

### A.    Conversion of Money

Defendants' first conversion claim is that Estes, with the participation and knowledge of Albers, wrongfully charged gasoline to Tri-State's account, amounting to a conversion of cash monies.  In support of their motion for summary judgment, plaintiffs argue that Estes had permission to charge the purchase of gasoline to Tri-State's account, Estes paid Tri-State for gasoline he purchased the day he quit, and Albers had no involvement in the alleged conversion.

### 1.    Albers

The only allegations against Albers are that he was in the car with Estes and knew that Estes was purchasing gasoline with the Tri-State credit card.  Albers admits to these facts, but his mere presence at the scene of an alleged conversion is insufficient to prove liability.

Defendants rely on the Supreme Court of South Dakota decision of Northern Finance Corporation v. Midwest Commercial Credit Co., 59 S.D. 282 (S.D. 1931).  In Northern Finance, the court adopted the rule that several persons may be joined as defendants in a tort action only if there is "such a concert of action or unity of design among the several wrong-doers as to constitute them joint tort-feasors." Id. at 243.  The court found, however, that "[p]ersons are not jointly liable for a tort merely because they

may have some connection with it. . . . There must be co-operation in fact."
Id. (quoting Bliss on Code Pleading § 83).

Interpreting the facts in the light most favorable to defendants, there
are no facts to support defendants' contention that Albers worked with Estes
to plan and execute the alleged conversion.  Albers did nothing to exercise
control or dominion over defendants' funds by sitting in Estes' car while
Estes filled his gas tank.  Defendants offer no facts to suggest that Albers
and Estes planned together to make an unauthorized purchase of gas on Tri-
State's account.  Defendants have only alleged facts to show that Albers was
somehow connected with the purchase of gas through his presence in Estes'
car, which is insufficient to support a conversion claim against him.  Thus,
Albers is entitled to judgment as a matter of law, and Albers' motion for
summary judgment on the first conversion claim is granted with respect to
him.

### 2. Estes

With respect to Estes, a genuine dispute over the material fact of
whether the purchase of $42.02 of gasoline on Tri-State's account was
authorized precludes a grant of summary judgment.  The exercise of control
or dominion over the personal property of another is not a conversion unless
it is unauthorized.  Chem-Age Indus., 652 N.W.2d at 766.  Therefore, if Estes
had permission to purchase gas on the Tri-State account on August 10,

47

2006, the purchase did not amount to a conversion.  If Estes did not have permission, he would be liable for conversion even if he believed the purchase was authorized.  See Rensch, 393 N.W.2d at 271 (finding that conversion occurs even where act constituting conversion is done in good faith).

The parties agree that at some point during his employment, Estes was authorized to buy gasoline for personal use on the Tri-State account at the station across the street from the shop.  Estes argues that he had permission to do so on August 10, 2008.  Because he expected one more paycheck after he quit on that date, Estes contends that the gas purchase on that day was properly charged to Tri-State's account.  He offers the fact that Murra concedes that Estes' final paycheck may have been withheld to cover the price of the gas in support of his argument.  On the other hand, defendants argue that Stan withdrew permission for Estes to charge gasoline to the Tri-State account several weeks before August 10, 2006.  Moreover, the gas arrangement was part of Estes' employment, so the authorization terminated when Estes quit.[7]

---

[7]Defendants also argue that it is unclear whether Estes' last paycheck reimbursed Tri-State for the price of the gas because Estes also owed money to Tri-State for child support payments, taxes, and other debts.  Because this issue does not resolve the underlying issue of Estes' liability for conversion, the court will not discuss it further.

48

Because there is a genuine dispute as to the material fact of whether Estes was authorized to charge the price of the gas to Tri-State's account, Estes is not entitled to summary judgment.

**B.    Conversion of Tools and Supplies**

In their second conversion claim, defendants allege that plaintiffs converted equipment and supplies like sanders, tape, sand paper, and painting supplies from the Tri-State supply cupboard.  Plaintiffs move for summary judgment on the ground that defendants cannot offer direct proof that Albers and Estes took the equipment.

As noted, South Dakota defines conversion as the "unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right." Id.  It is not always possible for the person alleging conversion to provide eyewitness or other direct evidence of the act constituting conversion.  Indeed, even in a criminal case (where the standard of proof is much higher), a conviction for conversion can be sustained on the basis of circumstantial evidence:

> All of the evidence was circumstantial.  No one saw the appellant take any part of the missing funds and she denies having done so. It was, nevertheless, for the jurors, as the finders of the facts, to weigh the evidence pro and con, to draw inferences reasonably supported by the evidence and in the end to say whether the government had established [defendant's] guilt beyond a reasonable doubt.

49

Doyle v. United States, 318 F.2d 419, 424 (8th Cir. 1963).

Here, no one saw Albers or Estes take the missing equipment, and they deny doing so.  But the heated atmosphere in which Albers and Estes quit and the fact that their supply closet was empty when the new workers began working may imply that Albers and Estes took the equipment and supplies without permission.  Plaintiffs counter that it would have been factually impossible for them to take the equipment without being seen, but there is a genuine dispute over whether Albers and Estes took the supplies from the Tri-State shop at some point after they resigned.  The question of whether plaintiffs unlawfully converted supplies from Tri-State is a question for the trier of fact.  Plaintiffs are not entitled to judgment as a matter of law on this claim, and their summary judgment motion is denied.

For the reasons discussed above, it is hereby

ORDERED that defendants' motion for summary judgment on plaintiffs' 42 U.S.C. § 1981 claims is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on plaintiffs' ERISA claims is granted.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on plaintiffs' FLSA claims is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment on defendants' conversion of cash moneys counterclaim is granted with respect to Albers and denied with respect to Estes.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment on defendants' conversion of personal property counterclaim is denied.

Dated October 27, 2008.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

51