# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENDON S. ALBERS and CHRISTOPHER ESTES, | ) ) ) | CR. 06-4242-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER ON POST-TRIAL MOTIONS |
| TRI-STATE IMPLEMENT, INC.; STEVE MELLEGARD, individually; and STAN MELLEGARD, individually, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Pending before the court are plaintiffs' renewed motion for judgment as a matter of law, or in the alternative, motion for a new trial, and motion to amend or alter the judgment (Docket 120), plaintiffs' motion for liquidated damages (Docket 117), and plaintiffs' motion for attorneys' fees (Docket 123).

## BACKGROUND

This case arises out of the employment of plaintiffs, Brendon S. Albers (Albers) and Christopher Estes (Estes), by defendant Tri-State Implement, Inc. (Tri-State).[1] Defendants Steve Mellegard (Steve) and Stan Mellegard (Stan) are the officers, directors, and shareholders of Tri-State. Albers, a member of an

---

[1] Plaintiffs originally sued Mellegard, Inc., a South Dakota corporation, d/b/a Tri-State Implement, Inc. During trial, the court granted judgment as a matter of law with regard to Mellegard, Inc., but ruled that Tri-State Implement, Inc. would remain as a defendant. The caption has been amended accordingly.

American Indian tribe, began working at Tri-State as a part-time laborer in January 2002. He was promoted to the position of head painter in June 2003. Albers did not receive health insurance benefits until he was promoted to head painter. Albers never received overtime pay while working at Tri-State. Estes, also a member of an American Indian tribe, began working at Tri-State in July 2005. He held the position referred to as "assistant to the head painter." Estes never received health insurance benefits or overtime pay during his employment at Tri-State. At some point during Estes' employment, defendants allowed him to buy gas for personal use at the station across the street from Tri-State and charge the price of the gas to the Tri-State account. Albers and Estes complain that Steve and Stan made offensive race-based comments to them in the workplace.

On August 10, 2006, Estes asked Stan for health insurance, and Stan told him he was not entitled to benefits. Estes and Albers informed defendants that they were quitting. They left Tri-State together in Estes' car, and Estes drove to the gas station across the street, put gas into his car, and charged Tri-State's account for the $42.02 purchase price. When a new employee began working at Tri-State, defendants discovered that certain tools and supplies were missing.

Plaintiffs filed suit against defendants, alleging wrongful denial of health insurance benefits on the basis of race and constructive discharge in violation of 42 U.S.C. § 1981 (§ 1981), wrongful denial of access to the company health insurance plan in violation of the Employee Retirement Income Security Act

(ERISA), and failure to pay overtime wages in violation of the Fair Labor Standards Act (FLSA). Defendants counterclaimed, alleging that plaintiffs unlawfully converted defendants' property and cash monies and that Albers owed money on a loan extended by Tri-State. Plaintiffs' constructive discharge and ERISA claims, as well as defendants' conversion of money claim against Albers, were dismissed at summary judgment, and Albers confessed judgment in favor of Tri-State for the loan before trial.

Plaintiffs' race discrimination claims, plaintiffs' FLSA claims, defendants' conversion of money claim against Estes, and defendants' conversion of property claim against both plaintiffs were tried to a jury on February 24, 2009, through February 27, 2009. On February 27, 2009, the jury returned a verdict in favor of Tri-State on Albers' race discrimination claim and Estes' race discrimination claim. The jury found in favor of Albers on his FLSA claim and awarded him $1,372.25 for the period of November 22, 2004, through August 10, 2006. The jury also found that Tri-State did not willfully violate the FLSA. The jury found in favor of Estes on his FLSA claim and awarded him $265.72 in damages.[2] With respect to defendants' counterclaims, the jury found in favor of defendants on their claim of conversion of money against Estes and awarded $42.02 in damages, and in favor of plaintiffs on defendants' claim of conversion of tools and supplies. Docket 111.

---

[2] The jury was not instructed to determine whether defendants willfully violated the FLSA with respect to Estes.

On March 13, 2009, the court entered judgment in favor of defendants and against Albers on Albers' claim of race discrimination under § 1981, judgment in favor of Albers and against defendants in the sum of $1,372.25 for violation of the FLSA, judgment in favor of defendants and against Estes on Estes' claim of race discrimination under § 1981, judgment in favor of Estes and against defendants in the sum of $265.72 for violation of the FLSA, judgment in favor of defendants and against Estes in the sum of $42.02 for conversion of money, judgment in favor of plaintiffs and against defendants on defendants' claim of conversion of tools and supplies, and judgment in favor of Tri-State and against Albers in the sum of $3,284 plus post-judgment interest as provided by law pursuant to the confession of judgment signed by Albers on February 11, 2009. Docket 113. The court also ordered that neither party was entitled to costs.

Now plaintiffs renew their motion for judgment as a matter of law, or in the alternative, move for a new trial, and move to amend or alter the judgment (Docket 120), move for an award of liquidated damages (Docket 117), and move for an award of attorneys' fees (Docket 123).

## I. Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, and Motion to Amend/Alter Judgment (Docket 120)

### A. Timeliness

Defendants argue that plaintiffs' renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment are untimely. Rules 50(b), 59(b), and 59(e), which govern

plaintiffs' postjudgment motions, require that plaintiffs' motions be brought within a certain time after the entry of judgment. The court may not extend the time to act under these rules. Fed. R. Civ. P. 6(b). Indeed, when a Rule 59 motion is untimely made, "the district court loses jurisdiction over that motion and any ruling upon it becomes a nullity." Sanders v. Clemco Indus., 862 F.2d 161, 168 (8th Cir. 1988) (citing Spinar v. South Dakota Bd. of Regents, 796 F.2d 1060, 1062 (8th Cir. 1986)).

### 1. Timeliness under Pre-December 1, 2009, Rules

Prior to December 1, 2009, Rule 50(b) provided that "[n]o later than 10 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Likewise, prior to December 1, 2009, the time period in which a party had to file a motion for a new trial under Rule 59(b) or a motion to alter or amend a judgment under Rule 59(e) was no later than 10 days after the entry of judgment. Fed. R. Civ. P. 59(b) and (e). Rule 6, which was also amended effective December 1, 2009, governs the computation of time periods specified in the Federal Rules of Civil Procedure. Fed. R. Civ. P. 6(a). Under the version of Rule 6(a) effective prior to December 1, 2009, the day of the act that began the period was excluded and, when the period was less than 11 days, intermediate Saturdays, Sundays, and legal holidays were excluded. Fed. R. Civ. P. 6(a)(1)-(2). Under these rules, plaintiffs' motions were untimely. Judgment was entered in this case on March 13, 2009. Docket 113. Because the time period was less than 11 days,

the intermediate Saturdays and Sundays—March 14, 2009, March 15, 2009, March 21, 2009, and March 22, 2009—are excluded from the time period computation.  Thus, 10 days after the entry of judgment was March 27, 2009.  Plaintiffs filed their motions on March 31, 2009,[3] so they were untimely.

Plaintiffs argue that they were entitled to 3 extra days for mailing under Rule 6(d).  Rule 6(d) provides that "[w]hen a party may or must act within a specified time *after service* and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a)."  Fed. R. Civ. P. 6(d) (emphasis added).[4]  Rule 6(d), however, only applies when the time period is triggered by "service."  Where, as here, the entry of judgment triggers the time period, Rule 6(d) does not provide for an additional 3 days for mailing.  Arnold v. Wood, 238 F.3d 992, 995 n.2 (8th Cir. 2001) ("We may not extend [plaintiff's] filing time by three days for mail service, see Fed. R. Civ. P. 6(e), because the ten-day filing period prescribed in Rule 59(e) runs from

---

[3] Plaintiffs originally filed their renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment electronically on March 30, 2009.  Docket 118.  But on March 31, 2009, the Clerk's Office instructed counsel for plaintiffs to refile the motion with a more detailed docket entry description, documented by the following electronic docket entry created by the Clerk's Office: "Remark: Called Attorney Deinert to refile Doc. 118 as a three-part motion.  (CMS) (Entered: 03/31/2009)."  So on March 31, 2009, counsel for plaintiffs submitted a notice of filing error with respect to the motion filed at Docket 118 on March 30, 2009, and filed the renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment at Docket 120.  Regardless of whether plaintiffs filed their motion on March 30, 2009, or March 31, 2009, it was untimely under the 10-day deadline.

[4] Rule 6(d) was not affected by the December 1, 2009, amendments.

the entry of judgment, rather than its service upon the parties."); see also 4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1171 at 587-88 (3d ed. 2002) ("[T]hree days will be added under Rule 6(e) only when the period in question is measured from the service of a notice or other paper; the subdivision is inapplicable when some other act or event commences the time period, such as the entry of judgment."). Thus, plaintiffs are not entitled to an additional 3 days under Rule 6(d), and their motions were untimely.

Plaintiffs advance a number of theories under which their renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment were timely.

### (a)    Finality of Judgment

Plaintiffs argue that their motions were not untimely because the March 13, 2009, judgment was not a final judgment that triggered the 10-day time period in Rules 50(b), 59(b), and 59(e). Plaintiffs' argument is unavailing. The judgment filed and entered on March 13, 2009, was set out in a separate document as required by Rule 58. See Fed. R. Civ. P. 58(a). The judgment stated that it was "ordered, adjudged, and decreed" that judgment was entered in favor of the applicable party and was signed by the court. Docket 113 at 2. And the electronic docket sheet indicates that the case was terminated on March 13, 2009. Based on these facts, the March 13, 2009, judgment was, on its face, a final judgment. See Reyher v. Champion Int'l Corp., 975 F.2d 483, 487 (8th Cir. 1992) (finding that judgment signed by the district court, reflected on a separate document, and entered on docket with notation "Terminates

Case" was a final judgment that complied with Rule 58). Moreover, plaintiffs treated the March 13, 2009, judgment as a final judgment by filing a renewed motion for judgment as a matter of law under Rule 50(b), an alternative motion for new trial under Rule 59(a), and a motion to alter or amend the judgment under Rule 59(e). See id. (considering that parties treated judgment as final judgment in filing motions to alter or amend the judgment under Rule 59). Each of these motions must be filed within a certain time after "entry of judgment." Plaintiffs did not challenge the finality of the March 13, 2009, judgment until they realized their motions may have been untimely.

Plaintiffs also argue that the March 13, 2009, judgment was not a final judgment because it did not address liquidated damages or attorneys' fees, which plaintiffs requested in their complaint and are mandatory under 29 U.S.C. § 216. Plaintiffs cite several cases holding that a judgment is not final for the purposes of appellate court jurisdiction under 28 U.S.C. § 1291 until the court determines the amount of attorneys' fees. Assuming that the standard for finality under § 1291 applies to the determination of when Rules 50 and 59 apply, the cases cited by plaintiff do not compel the conclusion that the court's March 13, 2009, judgment was not final because it did not address the amount of attorneys' fees to which plaintiffs are entitled. Plaintiffs cite Shelton v. Ervin, 830 F.2d 182, 184 (11th Cir. 1987) for the proposition that "attorney fees are an integral part of the merits of FLSA cases and part of the relief sought therein [so that] a final determination as to the award of attorney fees is required as part of the final appealable judgment." But Shelton's

reasoning is invalid in light of the Supreme Court's adoption of a "bright-line rule . . . that a decision on the merits is a 'final decision' for purposes of [28 U.S.C.] § 1291 whether or not there remains for adjudication a request for attorney's fees attributable to the case."  See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03 (1988).  Plaintiffs also cite Maristuen v. Nat'l State Ins. Co., 57 F.3d 673, 678 (8th Cir. 1995), in which the Eighth Circuit held that a judgment awarding damages but not deciding the amount of damages or finding liability but not fixing the extent of the liability is not a final and appealable judgment.  In Maristuen, the judgment stated, "plaintiff is entitled to bad faith damages in the form of attorney's fees, the amount of which will be determined by the court."  Id. at 677.  The court reasoned that Budinich did not apply because "the award of unquantified attorney fees here is set out in and is an integral part of the judgment entered . . . in accordance with the jury's verdicts."  Id.  The situation in Maristuen is not present in this case.  The March 13, 2009, judgment does not include an unquantified damage award. The judgment does not order that plaintiffs are entitled to liquidated damages or attorneys' fees in an amount to be determined by the court.  In the absence of such language, the March 13, 2009, judgment falls under the Budinich rule that a decision on the merits, which the March 13, 2009, judgment surely is, is a final judgment whether or not there remains for adjudication a request for attorneys' fees.  Plaintiffs' argument that the time period in Rules 50 and 59 were not triggered by the March 13, 2009, judgment because it did not address attorneys' fees is unavailing.

Likewise, plaintiffs offer no authority for their contention that in an FLSA case, the judgment is not final until the court has addressed the issue of liquidated damages.  Indeed, in Reyher v. Champion International Corporation, 975 F.2d at 488, the Eighth Circuit explained that the timeliness of a motion for liquidated damages under the Age Discrimination in Employment Act (ADEA) "must be determined under Rule 59 and Rule 60, the rules applicable to postjudgment motions."  The Eighth Circuit explicitly rejected the argument that Rule 59 does not apply to a motion for liquidated damages because these damages should be automatically added by the district court.  Id.  The Eighth Circuit explained that the Supreme Court has stated that a motion for prejudgment interest must be made under Rule 59 even if this remedy is available as a matter of right.  Reyher, 975 F.3d at 488 (citing Osterneck v. Ernst & Whinney, 489 U.S. 169, 176 n.3 (1989)).  Further, the Eighth Circuit reasoned, an award of liquidated damages under the ADEA is not a "ministerial" task for the district court.  Id.  Rather, the court must make a " 'painstaking study' of the plaintiff's case on the merits."  Id. (internal citation omitted).  Finally, the Eighth Circuit explained that ADEA liquidated damages are punitive in nature, and Rule 59 applies to postjudgment motions for punitive damages.  Reyher, 975 F.3d at 488.

Although there are some differences between liquidated damages under the ADEA and under the FLSA,[5] the court finds that the Eighth Circuit's

_____

[5] The Supreme Court has explained that "the remedial provisions of the two statutes are not identical.  Congress declined to incorporate into the ADEA

reasoning in Reyher compels the conclusion that a motion for liquidated damages under the FLSA must be brought under Rule 59 or Rule 60. Just as a motion for liquidated damages under the ADEA requires the court to examine the case on the merits, a request for liquidated damages under the FLSA may require the court to consider the evidence and determine if the defendant employer's FLSA violation was in good faith and reasonable. See 29 U.S.C. § 260. And even if liquidated damages are available as a matter of right, they should not be considered a "collateral" matter to which Rule 59(e) does not apply. See Osterneck, 489 U.S. at 169, 175 (explaining that motion for prejudgment interest does not raise issues wholly collateral to the judgment in the main cause of action). The rule that a motion for liquidated damages must be made pursuant to Rule 59 or Rule 60, both of which are postjudgment motions, belies plaintiffs' argument that a judgment in a FLSA case is not final for the purposes of triggering the time period in the postjudgment motions until the court has determined the issue of liquidated damages. Plaintiffs' argument

---

several FLSA sections. Moreover, § 16(b) of the FLSA, which makes the award of liquidated damages mandatory, is significantly qualified in ADEA § 7(b) by a proviso that a prevailing plaintiff is entitled to double damages 'only in cases of willful violations.' " Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985). Unlike the punitive nature of liquidated damages under the ADEA, liquidated damages under the FLSA "are not considered punitive, but are intended in part to compensate employees for the delay in payment of wages owed under the FLSA." Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 941 (8th Cir. 2008) (internal quotation omitted). But there is no indication in Reyher that the punitive nature of liquidated damages under the ADEA was key to its ruling that Rule 59(e) applies to a motion for liquidated damages.

that the 10-day time periods in Rules 50(b), 59(a)-(b), and 59(e) have not begun is unavailing.

**(b)      Construction of Motions under Rule 60**

Next plaintiffs argue that their motions should be construed as Rule 60 motions and as a result, be considered timely.  As relevant to plaintiffs' argument, Rule 60(b) permits the court, upon a party's motion made within a reasonable time—and for reasons (1), (2), and (3), no more than one year after the entry of judgment—to grant relief from a final judgment on grounds of "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; . . . or (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b).[6] "Rule 60(b) provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances."  Reyher, 975 F.2d at 488 (internal quotation omitted).  "It does not provide a 'safe harbor' for all who exceed the time limits of Rule 59."  Wilson v. Runyon, 981 F.2d 987, 989 (8th Cir. 1992) (per curiam).  "[B]efore treating a post-trial motion filed more than ten days after a final judgment as a Rule 60(b) motion, the district court [must]

---

[6] Plaintiffs also assert that their motions should be construed under Rule 60(d), which merely states that Rule 60 does not limit the court's power to entertain an independent action to relieve a party from a judgment, order, or proceeding; grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or set aside a judgment for fraud on the court. There is no allegation that any of these circumstances apply in this case.

determine that the motion on its face *alleges* grounds for relief available under Rule 60." Id.

Here, plaintiffs' renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment do not allege grounds for relief available under Rule 60. Plaintiffs do not allege any mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud, misrepresentation, or misconduct by defendants. Plaintiffs have made no showing of "exceptional circumstances," as required to construe their motions as Rule 60 motions. "[W]hen a motion can fairly be characterized as one under Rule 59(e) (*i.e.*, lacking any special circumstances justifying relief under Rule 60(b)) it must be filed within the 10-day period and will not be treated under Rule 60(b)(1)." Reyher, 975 F.2d at 488 (internal quotation omitted). Plaintiffs' argument that their motions should be construed under Rule 60 is unavailing.

### 2. Application of Amended Rules

Finally, plaintiffs argue that the December 1, 2009, amendments to Rules 50 and 59 apply to their renewed motion for judgment as a matter of law, alternative motion for a new trial, and motion to amend or alter the judgment. Under the amended version of Rule 50(b), a party may file a renewed motion for judgment as a matter of law "[n]o later than 28 days after the entry of judgment." Fed. R. Civ. P. 50(b). Likewise, under the amended versions of Rule 59(b) and 59(e), motions for a new trial and to alter or amend the judgment must be filed no later than 28 days after the entry of judgment. Fed.

R. Civ. P. 59(b), 59(e).  In amending the Federal Rules of Civil Procedure, the Supreme Court ordered that the amended rules "shall take effect on December 1, 2009, and shall govern in all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending."  Order, Mar. 26, 2009, available at

http://www.supremecourtus.gov/orders/courtorders/frcv09.pdf.  The present case was pending on December 1, 2009, because the court had not ruled on plaintiffs' postjudgment motions.  Thus, the amended rules must govern plaintiffs' motions if "just and practicable."  Id.

Amended rules should be given retroactive application "to the maximum extent possible" and should apply unless their application "would work injustice."  Burt v. Ware, 14 F.3d 256, 258-59 (5th Cir. 1994) (internal quotations omitted).  The Eighth Circuit has explained that "the determination of when it is 'just and practicable' to retroactively apply [an amended version of a rule] is necessarily a case-by-case consideration."  United States v. Duke, 50 F.3d 571, 575 (8th Cir. 1995) (considering amendment to Rule 4(a)(4) of the Federal Rules of Appellate Procedure).

The court finds that it would be just and practicable to apply the amended versions of Rules 50(b), 59(b), and 59(e) to plaintiffs' pending motions.  The Supreme Court announced the proposed amended rules on March 26, 2009, one day before plaintiffs' motions were due under the then-applicable version of the rules.  Thus, both parties had notice that the time periods would likely be expanded.  Defendants have had ample opportunity to

14

brief the timeliness issue and respond to plaintiffs' request that the court apply the amended version of the rules. The parties have also fully briefed the motions on their merits, so there is no indication that defendants relied on the pre-December 1, 2009, rules to their detriment. Defendants may lose the "potential 'windfall' " of having plaintiffs' motions dismissed on the timing issue, but this loss does not equate to prejudice to defendants. See Burt, 14 F.3d at 260 ("The appellees will not be prejudiced by employment of the new rules; rather, they will have simply lost a potential 'windfall' of having the appeal dismissed." (internal citation omitted)). And, application of the amended rules is practicable in this case because it does not require any additional briefing or argument.

The court's conclusion that application of the amended rules would be just and practicable in this case is bolstered by the decision of other courts to apply or not apply previous amendments to Rule 59 in favor of consideration on the merits. In Long v. Simmons, 77 F.3d 878, 879 (5th Cir. 1996), the Fifth Circuit found that the December 1, 1995, amendment to Rule 59(e) should be given retroactive application so that the plaintiff's motion was timely. Under the previous version of Rule 59(e), which was in effect when the plaintiff filed his motion in February of 2005, a motion to alter or amend a judgment had to be served within 10 days of the entry of judgment. Id. The plaintiff's motion was untimely under that version of Rule 59(e). Under the amended version of Rule 59(e), which went into effect over 9 months after the plaintiff filed his motion, a motion to alter or amend a judgment had to be **filed** within 10 days

of the entry of judgment.  Id.  The plaintiff's motion was timely under the amended rule, and the court concluded that the amended rule should be applied in that case.  Id.  In Alvarez v. City of Westmorland, No. 96-55431, 119 F.3d 5 (table decision), 1997 WL 407872, at *1 (9th Cir. July 21, 1997), the Ninth Circuit declined to apply the 1995 amendment to Rule 59(b) which would have made the plaintiff's motion untimely because it would be "unjust and impracticable for this court not to address the merits."

There is little guidance on the question of whether the December 1, 2009, amendments to Rules 50(b), 59(b), and 59(e), should be applied retroactively.  Compare Kalos v. Law Offices of Eugene A. Seidel, P.A., No. 1:09cv833 (JCC), 2009 WL 4683551, at *2 (E.D. Va. Dec. 3, 2009) (applying without discussion 28-day deadline to Rule 59(e) motion filed on November 5, 2009) with Trepanier v. City of Blue Island, No. 08-4070, 2010 WL 411109, at *1 (7th Cir. Feb. 3, 2010) (finding Rule 59(e) motion filed October 17, 2009, untimely under 10-day time limit without discussing whether application of amended rule would be just and practicable).  But Long and Alvarez suggest that application of the amended rules in a way that allows the court to consider the merits of the postjudgment motions is just and practicable.

Defendants' only argument against application of the amended rules is that there is a presumption against retroactive application of legislation that would alter jurisdiction.  Defendants' argument, and their reliance on Landgraf v. USI Film Prods. 511 U.S. 244 (1994), is unavailing.  Landgraf does not support defendants' argument that there is a presumption against

retrospective application of legislation altering jurisdiction.  As the Supreme

Court noted in Landgraf, 511 U.S. at 274, the court has retroactively applied

"statutes conferring or ousting jurisdiction, whether or not jurisdiction lay

when the underlying conduct occurred or when the suit was filed."  And,

defendants ignore the distinction the Supreme Court drew between changes in

procedural rules and changes in substantive law: "[c]hanges in procedural

rules may often be applied in suits arising before their enactment without

raising concerns about retroactivity."  Id. at 275.

But most importantly, defendants' argument ignores Landgraf's

pronouncement that when faced with a retroactivity question, "the court's first

task is to determine whether Congress has expressly prescribed the statute's

proper reach.  If Congress has done so, of course, there is no need to resort to

judicial default rules."  Id. at 280.  In the context of the Federal Rules of Civil

Procedure, the enabling statute authorizing the Supreme Court to prescribe

rules and amendments provides,

> [t]he Supreme Court may fix the extent such rule shall apply to
> proceedings then pending, except that the Supreme Court shall not
> require the application of such rule to further proceedings then
> pending to the extent that, in the opinion of the court in which
> such proceedings are pending, the application of such rule in such
> proceedings would not be feasible or would work injustice, in
> which event the former rule applies.

28 U.S.C. § 2074.  Consistent with Congress's authorization, the Supreme

Court has ordered that the December 1, 2009, amendments shall govern all

proceedings pending on December 1, 2009, "insofar as just and practicable."

Order, March 26, 2009.  Thus, to the extent there is a presumption against

retroactive application of legislation affecting jurisdiction, this presumption does not apply in light of Congress's authorization of application of amendments to the Federal Rules of Civil Procedure in certain cases pending when the amendments took effect.

Further, defendants' argument that application of the amended rules in this case would impermissibly expand the court's jurisdiction is belied by several cases applying amended rules in a manner that allowed the court to address the merits of a matter it would not have had jurisdiction to address under the previous rules. For example, in Long, the court applied the amended version of Rule 59(e) so that a motion that would have been untimely under the old rule (and therefore outside of the court's jurisdiction) was timely. Similarly, many courts, including the Eighth Circuit, have applied the amended version of Rule 4(a)(4) of the Federal Rules of Appellate Procedure to determine the validity of a notice of appeal filed before the effective date of the amendment. In these cases, application of the amended version of Rule 4(a)(4) resulted in the court having jurisdiction to hear the appeal when it would not have had jurisdiction under the previous version of the rule.[7]  See, e.g., Duke, 50 F.3d at

---

[7]  The amendment to Rule 4(a)(4) relates to the validity of a notice of appeal filed during the pendency of a motion to alter or amend the judgment under Rule 59(e).  In these cases, at the time the appellant filed his notice of appeal, "Rule 4(a)(4) plainly stated that a notice of appeal filed during the pendency of a motion to alter or amend the judgment 'shall have no effect.' " Wallis v. J.R. Simplot Co., 26 F.3d 885, 887-88 (9th Cir. 1994).  Under the amended version of Rule 4(a)(4), effective after the notice of appeal was filed, "when a notice is prematurely filed, it 'shall be in abeyance, and shall become effective upon the date of entry of an order that disposes of the last of all such motions.' " Id. (quoting Fed. R. App. P. 4(a)(4)).  Under the old rule, the notice of

575-77; Wallis v. J.R. Simplot Co., 26 F.3d 885, 887-88 (9th Cir. 1994); Burt, 14 F.3d at 257-60 (finding that appellate court would have jurisdiction after district court ruled on pending postjudgment motions). These cases suggest that application of the amended version of a rule may be "just and practicable" even where it would alter the determination of the court's jurisdiction to address the motion to the detriment of the nonmoving party. But see Portley-El v. Milyard, No. 09-1327, 2010 WL 369378 at *3 n.8 (10th Cir. Feb. 3, 2010) (declining to apply amended version of Rule 4(a)(6) of Federal Rules of Appellate Procedure because district court applied then-current version of rule and the amended rule would give the plaintiff the "unexpected benefit of more time to file the appeal, which would alter the outcome of the jurisdictional issue to the prejudice of the non-moving party").

Taking into account all of the circumstances of this case, the court finds that application of the amended versions of Rules 50(b), 59(b), and 59(e) to plaintiffs' pending motions would be just and practicable. Thus, the deadline for plaintiffs' to file their motions was 28 days after the entry of judgment. Under the amended version of Rule 6(a), when the time period is stated in days or a longer unit of time, the court must exclude the day of the event that triggers the period and then count every day, including intermediate Saturdays, Sundays, and legal holidays. Fed. R. Civ. P. 6(a). Under these

---

appeal in the case was a nullity, so the court did not have jurisdiction to hear the appeal. But under the amended rule, the notice of appeal was effective, and the court had jurisdiction to address the appeal.

rules, plaintiffs' motions were due on April 10, 2009. Plaintiffs timely filed their motions on March 31, 2009. As a result, the court will address the merits of the motions.

### B. Renewed Motion for Judgment as a Matter of Law

At the close of defendants' case-in-chief, plaintiffs moved for judgment as a matter of law on plaintiffs' claim that they were wrongfully denied health insurance on the basis of their race in violation of 42 U.S.C. § 1981. The court denied the motion. Now plaintiffs renew their motion for judgment as a matter of law. A motion for judgment as a matter of law presents a legal question to the trial court of whether there is sufficient evidence to support a jury verdict. Fox v. T-H Continental, Ltd., 78 F.3d 409, 413 (8th Cir. 1996). The court will grant a motion for judgment as a matter of law "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Ehrhardt v. Penn. Mut. Life Ins. Co., 21 F.3d 266, 269 (8th Cir. 1994). In considering the motion, the court views the record in the light most favorable to the prevailing party. Wash Solutions, Inc. v. PDQ Mfg., Inc., 395 F.3d 888, 892 (8th Cir. 2005). The court must also assume that all conflicts in the evidence were resolved in favor of the prevailing party, and the court must assume as proved all facts that the prevailing party's evidence tended to prove. E.E.O.C. v. Kohler Co., 335 F.3d 766, 772 (8th Cir. 2003). The motion must be denied unless the court concludes that no reasonable juror could have returned a verdict for the nonmoving party. Billingsley v. City of Omaha, 277 F.3d 990, 995 (8th Cir. 2002). The Eighth Circuit has observed

that "judges must be extremely guarded in granting judgments as a matter of law after a jury verdict." Kohler Co., 335 F.3d at 772.

In order to prevail on his race discrimination claim, each plaintiff must prove that (1) Tri-State denied him health insurance benefits, and (2) his race was a motivating factor in Tri-State's decision. King v. Hardesty, 517 F.3d 1049, 1057 (8th Cir. 2008) ("[T]he plaintiff must provide evidence[] showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated[] the adverse employment action." (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). Further, race was a motivating factor if it played a part in Tri-State's decision to deny plaintiffs health insurance benefits. But plaintiffs' race need not have been the only reason for Tri-State's decision to deny health insurance benefits. See Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit (2008), § 5.96.

Here, plaintiffs presented evidence that defendants denied them health insurance benefits because Steve and Stan believed that plaintiffs were eligible for health coverage through Indian Health Services (IHS). Defendants presented evidence that they denied plaintiffs health insurance benefits because the position they held, sometimes referred to as the "clean-up" or "yucky" position, was not eligible for health insurance benefits. Viewing the record in the light most favorable to defendants, as the court must on plaintiffs' motion for judgment as a matter of law, the court finds that plaintiffs have

failed to show that no reasonable juror could have returned a verdict in favor of defendants.  See [Wash Solutions, 395 F.3d at 892](#).

Steve and Stan both testified that they believed Albers and Estes received health care through IHS.  Steve testified that he thought Albers had health insurance through IHS, but Albers never personally told Steve that.  Steve initially denied that IHS coverage was one of the reasons Albers did not receive health insurance benefits, but later agreed that he did not give Albers health insurance benefits because he thought Albers was covered under IHS and because Tri-State did not consider Albers a full-time, long-term employee.  Stan testified that Albers told Stan that he did not need health insurance because he was covered by IHS when Albers dropped his health insurance coverage in favor of a cash stipend.

With respect to Estes, Steve testified that he assumed Estes had IHS coverage, but that he never asked Estes.  Steve testified that Estes did not receive health insurance benefits because Estes was not full-time and because Estes had IHS coverage.  Stan testified that Estes told him that Estes did not need health insurance and that Estes led Stan to believe that he had "reservation insurance."  Estes testified that he never talked to Stan about anything called "reservation insurance."  During his deposition, Stan testified that he merely assumed Estes had "reservation insurance."  Steve testified at trial that even if he had been mistaken that Albers and Estes received health insurance through IHS, he would have denied them health insurance benefits.

On the other hand, defendants presented evidence that Albers and Estes were denied health insurance benefits because the position they held was not eligible for this benefit, not because of their race. Steve testified that full-time employees at Tri-State get health insurance. Steve testified that he uses "full time" to refer to the longevity of a position rather than the hours. He explained that Albers did not get health insurance after he began working full-time at Tri-State (about two weeks into his employment) because the entry-level clean-up position Albers held was not a full-time, long-term position. Albers got health insurance after he entered the head painter position, which was a position Tri-State always needs to have filled. Steve testified that the entry-level clean-up position was the least vital to Tri-State. He considered the full-time positions of mechanic, painter, truck driver, and bookkeeper to be vital to the organization. Steve testified that Albers and Estes did not receive health insurance benefits when they held the clean-up position because this was the lower-tier, least vital position at Tri-State.

Taken in the light most favorable to defendants, the evidence supports defendants' position that Albers and Estes did not receive health insurance benefits because of the position they held. As noted, Steve testified that Albers received health insurance benefits once he was promoted to the head painter position. It was reasonable for the jury to infer from this fact that Albers did not receive health insurance benefits before his promotion because of the position he held, rather than because of his race. See Ehrhardt, 21 F.3d at 269 (indicating that court should consider reasonable inferences of evidence).

Similarly, Albers testified that he had pushed Steve for a retirement plan for all employees for about three months. About one and a half years before Albers quit, Tri-State adopted a retirement plan for its employees. Albers testified that he was treated the same as the other employees with respect to the retirement plan. It was reasonable for the jury to infer from the facts that Albers successfully campaigned for a retirement plan and that Albers received this benefit (while he was in the position of head painter) that defendants did not previously deny Albers health insurance on the basis of his race.

And, taken in the light most favorable to defendants, the evidence shows that Estes was hired as a short-term employee. Stan testified that Estes was hired as a temporary employee and that he told Estes that his position was probably temporary. Stan testified that he told Estes that he wanted help cleaning two combines and other equipment. Stan testified that he believed Estes would be at Tri-State for 30-45 days. Estes testified that nobody at Tri-State made any promises to him about the number of hours or length of time he would work there. On the other hand, Norm Mellegard (Norm), father of Steve and Stan and founder of Tri-State, testified that he hired Estes and told Estes that he would work full-time. Taking the evidence in the light most favorable to defendants, the evidence shows that Estes was hired as a short-term employee (who may have worked full-time hours). Thus, this evidence tends to support Steve and Stan's explanation that Estes did not receive health insurance benefits because he held the short-term position.

Further, viewing the evidence in the light most favorable to defendants, the evidence tends to show that no one in the entry-level clean-up position received health insurance, regardless of race. Defendants presented evidence that the person hired after plaintiffs quit was hired to cover both the head painter position (previously held by Albers) and the clean-up position (previously held by Estes). Jason Van Den Oever (Van Den Oever), a non-Native American, testified that he was hired to do washing, painting, and clean-up at Tri-State. He did not have an assistant. He also testified that Steve told him health insurance was a benefit after 60 days, and Tri-State's bookkeeper, Loxie Murra (Murra), asked him about health insurance at the end of his first 60 days. Van Den Oever received health insurance benefits after being on the job for 60 days. Steve testified that he hired one person (Van Den Oever) to replace both Albers and Estes after they quit. Van Den Oever did both jobs. Stan also testified that Tri-State hired Van Den Oever to replace both Albers and Estes. Murra testified at trial that Van Den Oever replaced both Albers and Estes. During her deposition, however, Murra testified that Van Den Oever replaced Estes only. On a motion for judgment as a matter of law the court must resolve all conflicts in favor of the nonmoving party, so the court considers as proved Murra's trial testimony that Van Den Oever was hired to replace both Albers and Estes. See Kohler Co., 335 F.3d at 772.

Defendants also presented evidence that the white employee that Tri-State eventually hired to fill Estes' former clean-up position did not receive health insurance benefits. Steve testified that Tri-State did not hire a

replacement for the temporary, "yucky" job previously held by Estes until Norman Haeffner (Haeffner) was hired six months before trial. Steve testified that Haeffner filed a job application for the painter position, but did not get hired for that job. Tri-State offered him the clean-up job. Steve testified that Haeffner receives wages and paid holidays but does not receive paid vacation or health insurance benefits. Steve testified that Haeffner works 38-42 hours a week. Steve testified that Haeffner, who is white, does not receive health insurance benefits because he works on an as-needed short-term basis. Steve testified that Haeffner is elderly and retired and wants limited hours. He is covered by Medicare. Stan testified that Haeffner works 35-45 hours a week and does not receive health insurance because he holds a temporary job.

Haeffner testified that he did not apply for the head painter position when he first applied at Tri-State. He was looking for a part-time, fill-in job. Haeffner also testified that he was told that health insurance was a benefit and that Murra approached him with information about AFLAC after he worked at Tri-State for 60 days. She talked to him about health insurance, and he told her he only worked part time.

Plaintiffs argue that based on Haeffner's testimony, it is clear that Tri-State offered health insurance benefits to the white employee hired for the "yucky," as-needed, clean-up position. But Steve testified that Haeffner actually applied for the full-time position with benefits, and that when Steve told Haeffner that health insurance was a benefit, Steve was referring to the full-time position. Steve testified that after this conversation, Haeffner was

hired for the clean-up position. Steve also testified that he did not authorize Murra to talk to Haeffner about health insurance. Considering all of the evidence in the light most favorable to defendants and resolving any inconsistencies in favor of defendants, a reasonable jury could conclude that Haeffner, a white person hired for the clean-up position, did not receive health insurance benefits and that if Murra talked to him about this benefit, she was not authorized to do so.

Considering all of the evidence, the fact that Steve and Stan testified that they believed Albers and Estes received health coverage through IHS and that this was one of the reasons that Albers and Estes did not receive health insurance benefits does not show that no reasonable juror could have returned a verdict for defendants on plaintiffs' race discrimination claim. It was reasonable for the jury to find that the fact that defendants believed that Albers and Estes were covered by IHS does not mean that plaintiffs' race, rather than their eligibility for other coverage or their need for health insurance, was a motivating factor in defendants' decision to deny them health insurance benefits. The evidence in the record that Albers did receive health insurance benefits when he was promoted to the head painter position, that Estes was hired for the short-term clean-up position, that no other employee in the clean-up position received health insurance benefits, regardless of race, and that Steve would have denied Albers and Estes health insurance benefits even if he had been mistaken about their eligibility for IHS coverage is sufficient to support the jury's finding that plaintiffs' race was not a motivating factor in Tri-

State's decision to deny them health insurance benefits.  Plaintiffs have not shown that all the evidence points their way and is susceptible of no reasonable inferences sustaining the position of defendants.  Plaintiffs' renewed motion for judgment as a matter of law on their race discrimination claim is denied.

### C.     Alternative Motion for a New Trial

In the alternative to their renewed motion for judgment as a matter of law on their race discrimination claim, plaintiffs move for a new trial.  Under Federal Rule of Civil Procedure 59(a), the court may grant a motion for a new trial to all or any of the parties on all issues or on particular issues.  The standard for granting a new trial is whether the verdict is "against the great weight of the evidence."  Butler v. French, 83 F.3d 942, 944 (8th Cir. 1996).  In evaluating a motion for a new trial under Rule 59(a), the court must determine "whether a new trial is necessary to prevent a miscarriage of justice."  Maxfield v. Cintas Corp., No. 2, 563 F.3d 691, 694 (8th Cir. 2009).  For the reasons articulated above, the court finds that the jury's verdict in favor of defendants on plaintiffs' § 1981 claim is not against the great weight of the evidence.  A new trial is not necessary to prevent a "miscarriage of justice," so plaintiffs' alternative motion for a new trial is denied.

### D.     Motion to Amend or Alter the Judgment

Plaintiffs move to amend or alter the amount of damages awarded for defendants' violations of the FLSA pursuant to Rule 59(e).  "Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to

present newly discovered evidence." Lowry ex rel. Crow v. Watson Chapel School Dist., 540 F.3d 752, 761 (8th Cir. 2008) (quoting United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006)).  "A district court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Rule 59(e)."  Id.

The jury awarded $1,372.25 to Albers and $265.72 to Estes in damages for defendants' violation of the FLSA.  Plaintiffs asked the jury for $1,854.50 for Albers and $531.43 for Estes for the period of November 22, 2004, to August 10, 2006,[8] and now argue that the judgment should be amended to reflect these amounts.  Plaintiffs argue that their damages request was based on the number of overtime hours indicated by their time cards.

In an action for overtime wages brought under the FLSA, "the burden is upon the plaintiff to establish by a preponderance of the evidence the number of hours worked and the amount of damages due."  Johnson v. Dierks Lumber & Coal Co., 130 F.2d 115, 118 (8th Cir. 1942).  "When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records."  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946), superseded by

---

[8] 29 U.S.C. § 255(a) limits recovery of overtime wages to the period of two years preceding the filing of suit, unless the violation was a willful one, in which case recovery is limited to the three years preceding the filing of suit. The jury found that defendants did not willfully violate the FLSA with respect to Albers.  The jury was not asked to determine whether defendants willfully violated the FLSA with respect to Estes because he began working at Tri-State less than two years before plaintiffs filed suit.

statute on other grounds as stated in Carter v. Panama Canal Co., 463 F.2d 1289, 1293 (D.C. Cir. 1972).  But "[w]here an employer has not kept adequate records of wages and hours, its employees cannot be penalized by being denied a recovery of back wages on the ground that the precise extent of their uncompensated work cannot be proved."  Dole v. Tony and Susan Alamo Found., 915 F.2d 349, 351 (8th Cir. 1990) (citing Mt. Clemens, 328 U.S. at 687-88).  Thus, when the employer's records are inaccurate or inadequate,

> [o]nly a just and reasonable inference need be established as to the uncompensated work performed, and once the plaintiff has produced evidence of uncompensated labor, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence."

Id. (quoting Mt. Clemens, 328 U.S. at 687-88).  If the employer fails to produce such evidence, the court may award damages to the employee even though the result may be only approximate.  Donovan v. Tony and Susan Alamo Found., 722 F.2d 397, 404 (8th Cir. 1983).  The jury was instructed on this burden-shifting analysis in Final Instruction No. 16.[9]

The court will apply the burden-shifting analysis even though this analysis was developed for a situation where the employer seeks to avoid

---

[9] The last paragraph of Final Instruction No. 16 reads, "[t]he plaintiff has the burden to show the amount and extent of the work for which he was improperly compensated.  Tri-State then has the burden to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the plaintiff's evidence.  If Tri-State fails to produce such evidence, you may then award damages to the plaintiff, even though the result may be only approximate."

liability for overtime compensation based on the lack of evidence of uncompensated work in the time records, rather than the situation in the present case, where the employee seeks to rely on the employer's time records and the employer argues that the time records overstate the actual number of hours worked.  Plaintiffs presented their time cards as evidence that they worked more than 40 hours a week for certain weeks.  This evidence created a just and reasonable inference as to the amount of overtime hours plaintiffs worked.  Then the burden shifted to defendants to come forward with either evidence of the precise amount of work performed or evidence negating the reasonableness of the inference to be drawn from plaintiffs' evidence.  Defendants did not present evidence of the precise work performed, but they did present evidence negating the reasonableness of the inference to be drawn from the time cards offered by plaintiffs.

Defendants presented evidence that Albers and Estes did not always work full days.  Stan testified that he had a general idea how many hours Tri-State employees worked because he was often the last person to leave the shop.  Stan testified that Albers and Estes were not always prompt in the morning.  Sometimes, they did not get in until 10 a.m. or 10:30 a.m.  Stan testified that both Albers and Estes stayed until 5 p.m. or 5:30 p.m. on days when they came to work.  In particular, Stan testified that there were many mornings when Estes did not arrive at work by 7:30 a.m.  Stan testified that he saw Albers walk in late some days and leave early occasionally.  Likewise, Steve testified that he did not believe Albers and Estes worked all of the hours

indicated on their time cards. Steve testified that Albers and Estes were often late in the morning or coming back from lunch, but that they usually worked until 5 p.m. or 5:30 p.m. David Klinghagen (Klinghagen), who worked at Tri-State for about 4 months in the fall of 2005, also testified that Albers and Estes were frequently late to work or absent. Sometimes they were absent until noon.

Plaintiffs admitted that they did not always work full days. Albers testified that he arrived late frequently and left early sometimes. Estes testified that he arrived late in the morning because he had to take his son to school. Estes testified that he arrived between 7:40 a.m. and 7:50 a.m.

Defendants also presented testimony that Albers' and Estes' time cards did not accurately record the number of hours they actually worked. Defendants presented evidence that one employee punched all of the employees' time cards in the morning and evening. Steve and Van Den Oever both testified that one employee punched everybody in and out. Bill Spronk (Spronk), a Tri-State employee, testified that not every employee clocked himself in, and that one person clocked everybody out as they were leaving at the end of the day. Klinghagen testified that not every employee punched his own time card. Steve and Van Den Oever both testified that the employee punching the time cards did not punch the time card of an employee who was not present. But Klinghagen testified that there were times that all of the employee's time cards were punched in and Albers was not at the shop. Similarly, Tri-State employee Keith Kaiser (Kaiser) testified that he came into

Tri-State during non-working hours on one occasion and saw that Albers was punched in, but was not in the shop. Kaiser noticed that Albers was punched out later that night. Kaiser testified that he was aware that Albers did some work at Steve's and Stan's houses and he could have been working at one of their homes at the time.

Estes denied that another employee punched his time card when he was not there. Estes testified that he punched his own time card in the morning but that one employee punched everybody out at night. Spronk also testified that Estes clocked himself in.

Despite defendants' assertion that plaintiffs did not work all of the hours indicated on their time cards, Steve admitted that there were weeks that Estes worked more than 40 hours. Steve also testified that he did not have any information indicating that a particular time card of Estes' was incorrect. Stan also testified that he did not have any records to show that Estes worked a different number of hours than his time cards indicate. Stan admitted that Tri-State relied on the time cards to pay employees because Tri-State had nothing else to go by. Stan never confronted the employees about not working as many hours as their time cards indicated.

The jury was entitled to credit and consider the evidence that contradicted the inference that plaintiffs' time cards accurately reflect the hours they worked, namely that Albers and Estes frequently arrived late to work, that another employee punched all of the time cards even if one employee was not present, and that two Tri-State employees saw that Albers'

time card was punched in when Albers was not present at work.  The jury had copies of Albers' and Estes' time cards (Exhibits 1-6) and was entitled to compare the time cards with the testimony to determine whether the time cards provided an accurate measure of the hours Albers and Estes worked. The jury could reasonably conclude that Albers and Estes arrived to work late or worked a shortened day more times than were reflected on their time cards, so that plaintiffs were not entitled to overtime compensation for the number of hours indicated on their time cards.  See Mt. Clemens, 328 U.S. at 690 ("[I]t is generally recognized that time clocks do not necessarily record the actual time worked by employees.  Where the employee is required to be on the premises or on duty at a different time or where the payroll records or other facts indicate that work starts at an earlier or later time period the time clock records are not controlling.  Only when they accurately reflect the period worked can they be used as an appropriate measurement of the hours worked.").

Plaintiffs point out that the jury awarded exactly one-half of the damages they requested[10] and suggest that the jury reached a compromise verdict that is not supported by any substantial evidence.  But based on the testimony and exhibits presented at trial, the jury could reasonably find that Albers and Estes did not work all of the hours reflected on their time cards.  It was up to the jury

_____

[10] Plaintiffs asked the jury to award $2,744.50 to Albers, which was the amount of overtime compensation plaintiffs believed Albers was owed for the three years before they filed suit.  As noted, the jury found that defendants' violation was not willful, so Albers is only entitled to damages for the two years before he filed suit.

to determine the number of overtime hours for which each plaintiff must be compensated. The court cannot say that the jury improperly made this determination. Plaintiffs do not argue that the jury was erroneously instructed on the law, and based on the evidence negating the inference created by Albers' and Estes' time records, the court cannot conclude that the jury's award of damages reflects a manifest error of law or fact. Nor do plaintiffs present any newly discovered evidence. Plaintiffs' motion to alter or amend the judgment is denied.

## II.    Motion for Liquidated Damages (Docket 117)

Plaintiffs move for liquidated damages in the amount of $1,372.25 for Albers and $265.72 for Estes pursuant to 29 U.S.C. § 216(b).

### A.    Timeliness

Defendants argue that plaintiffs' motion for liquidated damages is untimely because plaintiffs were required to bring their motion under Rule 59(e), which (prior to December 1, 2009) required motions to alter or amend the judgment to be filed no later than 10 days after the entry of the judgment. Plaintiffs argue that 29 U.S.C. § 216(b), which provides for liquidated damages, does not require that a motion for such damages be brought pursuant to a certain rule or within a certain period of time. The Eighth Circuit has held that the timeliness of a motion for liquidated damages must be determined under Rule 59 or Rule 60. Reyher, 975 F.2d at 487-88. Plaintiffs' motion for liquidated damages does not allege any grounds for a Rule 60(b) motion, so the

court cannot construe it as such.  Wilson, 981 F.2d at 989.  Thus, the time period in Rule 59(e) applies.

As noted in Section I.A.1 above, pursuant to the version of Rule 6 in effect prior to December 1, 2009, a motion that must be filed before 10 days after the entry of judgment was due on March 27, 2009.  Plaintiffs filed their motion for liquidated damages on March 30, 2009, so their motion was untimely under the pre-December 1, 2009, version of Rule 59(e).  But, as explained in Section I.A.4 above, the court finds that application of the amended version of Rule 59(e) would be just and practicable in this case.  Under the amended version of Rule 59(e), plaintiffs' motion for liquidated damages must be filed within 28 days after the entry of judgment.  Here, judgment was entered on March 13, 2009, so plaintiffs' motion was due on April 10, 2009.  Plaintiffs filed their motion for liquidated damages on March 30, 2009, so it was timely under the current version of Rule 59(e).

### B.    Discussion

Any employer who violates the overtime provisions of the FLSA is liable for the amount of unpaid overtime compensation, as well as "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  The liquidated damages award is "mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA."  Braswell v. City of El Dorado, Ark., 187 F.3d 954, 957 (8th Cir. 1999).  If the employer makes such a showing to the satisfaction of the court, "the court may, in its sound discretion, award no liquidated damages or award any

amount thereof not to exceed the amount specified in section 216." 29 U.S.C. § 260.

To avoid an award of liquidated damages, the employer has the "affirmative burden to show both subjective good faith and objective reasonable grounds for belief of compliance." Jarrett v. ERC Props., Inc., 211 F.3d 1078, 1984 (8th Cir. 2000) (quoting McKee v. Bi-State Dev. Agency, 801 F.2d 1014, 1020 (8th Cir. 1986)). With respect to the subjective good faith requirement, "[t]he employer bears the burden of proving an honest intention to ascertain and follow the dictates of the FLSA." Hultgren v. County of Lancaster, Neb., 913 F.2d 498, 509 (8th Cir. 1990). "To carry his burden, a defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions." Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942 (8th Cir. 2008) (quoting Marlin v. Cooper Elec. Supply Co., 940 F.2d 896, 908 (3d Cir. 1991)). With respect to the reasonableness requirement, the employer must prove that its position was objectively reasonable. Hultgren, 913 F.2d at 509. The employer's "burden is a difficult one, with double damages being the norm and single damages the exception." Chao, 547 F.3d at 941 (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)).

Before considering the evidence, the court will address defendants' argument that because the jury found that Tri-State did not willfully violate the FLSA with respect to Albers, the court must find that defendants acted in good faith and with objective reasonableness in failing to pay Albers and Estes

overtime wages.  In order to find that defendants did not willfully violate the

FLSA, the jury must have found that plaintiffs did not prove by the greater

weight of the evidence that defendants knew their failure to pay overtime wages

was in violation of the FLSA or that defendants acted with reckless disregard of

the law.  See Final Instruction No. 14.  This finding does not necessarily

require the court to find that defendants have proved that they acted with good

faith and reasonableness for the purposes of determining whether to award

liquidated damages.  Cf. Broadus v. O.K. Indus., Inc., 226 F.3d 937, 944 (8th

Cir. 2000) (stating in Equal Pay Act case that "[t]he jury's decision on

willfulness is distinct from the district judge's decision to award liquidated

damages"); see also Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259,

1274 (11th Cir. 2008) ("For the willfulness issue on which the statute of

limitations turns, the burden is on the employee; for the good faith issue on

which liquidated damages turns, the burden is on the employer.  Because the

burden of proof is placed differently, a finding that willfulness was not present

may co-exist peacefully with a finding that good faith was not present.").

Indeed, as the Eighth Circuit has explained, "[l]ack of knowledge is not

sufficient to establish good faith."  Chao, 547 F.3d at 942.  "[A] district court's

finding . . . that the defendant had not 'knowingly and willfully intended to

avoid compliance with the Act' is not by itself enough to support the finding of

reasonable good faith."  Id. (quoting Marlin v. Cooper Elec. Supply Co., 940

F.2d 896, 909 (3d Cir. 1991)); see also id. (quoting Reich v. S. New England

Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997) ("That [the employer] did not

purposefully violate the provisions of the FLSA is not sufficient to establish that it acted in good faith.").  Not being bound by the jury's determination that defendants did not act willfully in failing to pay Albers overtime wages, the court will consider the evidence to determine whether defendants have shown that they acted reasonably and in good faith.

With respect to the subjective good faith requirement, the court finds that defendants have not shown that they had an honest intention to ascertain and follow the requirements of the FLSA.  Defendants argue that they honestly believed that all of their employees were exempt under 29 U.S.C. § 213(b)(1)(A), which exempts "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers" from the FLSA's overtime requirements.  But the only evidence that defendants took any affirmative steps to determine whether they were required to pay their employees overtime wages was the testimony of Murra that she called the South Dakota Department of Labor (South Dakota DOL) about overtime some time in the five years before trial.  Murra testified that she told the South Dakota DOL where she worked and described the duties of the employees. Murra testified that the South Dakota DOL said overtime was like a benefit similar to holidays and it was up to the employer's discretion to pay it or not. Murra never documented this conversation.  Murra testified that she did not tell Steve or Stan about the call before Albers and Estes quit.

Steve testified that he never sought professional advice on whether to pay Tri-State employees overtime wages.  He did not contact an accountant or the South Dakota DOL.  Steve testified that he knew that Murra checked with the South Dakota DOL, but he could not remember if he knew what Murra had done when Albers and Estes were still employed at Tri-State.  Steve testified that he believed Tri-State employees were exempt from overtime requirements under the Farm Bill.  Steve also testified that his father, Norm, said that Tri-State did not have to pay overtime.  Likewise, Stan testified that he believed Tri-State's employees were exempt from overtime pay requirements because Norm said they were.  Stan testified that he and Steve had no reason to alter that belief until after the lawsuit was filed.

Based on this evidence, the court concludes that defendants have not shown that they took affirmative steps to ascertain the FLSA's requirements.  Even if the court accepts as true Murra's testimony that she called the South Dakota DOL and accurately described the duties of each of the Tri-State employees, she did this without the direction of Steve or Stan, who admit that they were co-owners and co-managers of Tri-State.  Indeed, neither Steve nor Stan testified that they even knew about Murra's call to the South Dakota DOL at the time Albers and Estes were employed at Tri-State.  All that Steve and Stan did to determine whether Tri-State employees were covered under the FLSA was to accept Norm's word that all of the employees were exempt.  Furthermore, the court does not find credible Murra's testimony that the DOL

advised her that overtime for all employees is a benefit like holidays subject to an employer's discretion as to whether or not it is paid.

There is no evidence that Steve or Stan consulted the South Dakota DOL, the United States Department of Labor's Wage and Hour Division, or an attorney about the FLSA's requirements and exemptions. Similarly, there is no evidence that Steve or Stan otherwise researched the FLSA's requirements or the Farm Bill or read any of the regulations or cases that defendants now cite in support of the mechanics exemption. And the evidence defendants have, that Murra called DOL for advice, is not credible. For the purposes of the good faith determination, it makes no difference that the Southern District of Florida held that an employee whose job tasks were similar to those of Albers and Estes fell under the mechanics exemption if no one at Tri-State read this case at the time defendants failed to pay Albers and Estes overtime wages. See Viart v. Bull Motors, Inc., 149 F. Supp. 2d 1346 (S.D. Fla. 2001).

Even if Murra's testimony was credible, evidence of Murra's unilateral decision to contact the South Dakota DOL is not enough to sustain defendants' burden of showing that they acted in good faith in failing to pay Albers and Estes overtime wages in light of Steve and Stan's failure to take any steps to ascertain the FLSA's requirements with respect to Albers and Estes or to verify Norm's assertion that Tri-State's employees were exempt. See Mireles v. Frio Foods, Inc., 899 F.2d 1407, 1415 (5th Cir. 1990) (finding that employer did not show it acted reasonably and in good faith when the only evidence was that employer's general manager discussed minimum wage requirements with the

41

state employment commission and reviewed some brochures and pamphlets on this topic). Defendants have failed to establish an honest intention to meet the FLSA's requirements, which is required to avoid liability for liquidated damages under 29 U.S.C. § 260. Because defendants cannot demonstrate good faith, the court need not reach the reasonableness issue.[11]

Plaintiffs' motion for liquidated damages is granted. Albers is awarded an additional amount of $1,372.25 in liquidated damages under 29 U.S.C. § 216(b), for a total of $2,744.50 in damages for defendants' violation of the FLSA. Estes is awarded an additional amount of $265.72 in liquidated damages under 29 U.S.C. § 216(b), for a total of $531.44 in damages for defendants' violation of the FLSA.

## III.    Motion for Attorneys' Fees (Docket 123)

Plaintiffs move for an award of their attorneys' fees pursuant to 29 U.S.C. § 216(b). Under 29 U.S.C. § 216(b), when defendants have violated the FLSA's overtime requirements, "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid

_____

[11] The court is aware that uncertainty about the application of the FLSA is a factor the court may consider in determining the appropriateness of liquidated damages. See Hultgren, 913 F.2d at 509. The question of whether the mechanics exemption applies to Albers and Estes may be the type of uncertainty the court would normally consider in determining whether a FLSA violation was reasonable. But in this case, defendants have not shown that they made any efforts to ascertain the contours of the mechanics exemption, and their reliance on the blanket statement of their father that Tri-State's employees are exempt from overtime requirements does not satisfy the requirement that they honestly intended to determine and follow the requirements of the FLSA.

by the defendant." Plaintiffs request an award of $98,809 plus sales tax. Defendants argue that plaintiffs' motion for attorneys' fees should be denied because their motion was untimely and because plaintiffs' recovery was "technical" or "de minimis." If the court does award attorneys' fees, defendants argue, the requested amount should be significantly reduced.

## A. Timeliness

Local Rule 54.1(C) governs the timing of motions for attorneys' fees. Under the version of Local Rule 54.1(C) in effect when plaintiffs filed their motion, a motion for attorneys' fees must be filed within 30 calendar days after the entry of judgment. D.S.D. Civ. L.R. 54.1(C).[12] The Local Rules do not provide rules for the computation of time periods, so the court looks to Rule 6 of the Federal Rules of Civil Procedure. Under the version of Rule 6(a) in effect prior to December 1, 2009, the day of the event that begins the period is excluded, intermediate weekends and holidays are not excluded when the time period is greater than 11 days, and if the last day of the period is a Saturday, Sunday, or legal holiday, the period runs until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)-(3). Because the time period in Local Rule 54.1(C) is triggered by the entry of judgment, Rule

_____

[12] Local Rule 54.1(C) was amended effective December 1, 2009. Under the amended version of the rules, a motion for attorneys' fees must be made within 28 days after entry of judgment. D.S.D. Civ. L.R. 54.1(C). Because the amended rule shortens the time period within which plaintiffs may file their motion, the court finds that it would not be just and practicable to apply the amended rule to plaintiffs' motion for attorneys' fees. Even if the new 28-day deadline applied, the court would find that plaintiffs' late filing was justified by excusable neglect.

6(d) does not allow an additional 3 days for mailing. See Arnold, 238 F.3d at 995 n.2. Here, judgment was entered on March 13, 2009. Thirty days after March 13, 2009, was April 12, 2009, a Sunday, so the 30-day period was extended to the end of the day on April 13, 2009. Plaintiffs filed their motion on April 15, 2009, so it was untimely. The "failure to move for an award of attorney's fees within the prescribed time may be considered by the Court to be a waiver of any claim for attorney's fees." D.S.D. Civ. L.R. 54.1(C).

In this case, the court exercises its discretion to allow plaintiffs' untimely motion for attorneys' fees. See id. (stating that district court may, but is not required to, consider failure to move for attorneys' fees within the prescribed time as a waiver of any claim for such fees); see also Reyher, 975 F.2d at 489 (affirming district court's grant of motion for attorneys' fees filed 39 days late because the application of local rules is a matter peculiarly within the district court's province). In deciding to allow plaintiffs' untimely motion, the court has considered the standard for excusable neglect[13] under Rule 6(b)(2) of the Federal Rules of Civil Procedure.[14] "[E]xcusable neglect includes late filings

---

[13] Plaintiffs raised their excusable neglect argument in a 4-page reply brief in support of their motion for attorneys' fees. See Docket 137. Defendants argue that a reply brief is not authorized under Local Rule 54.1(C) and request that the court disregard or strike plaintiffs' reply brief. Without deciding whether the reply brief was authorized, the court declines to strike or disregard it because defendants were granted the opportunity to file a surreply and as a result did not suffer any prejudice.

[14] Rule 6(b)(2) does not govern this case because plaintiffs have not made a motion to extend the deadline for their motion for attorneys' fees. But courts in this district have considered the excusable neglect standard in considering the timeliness of a motion for attorneys' fees in the absence of a motion to

caused by inadvertence, mistake, or carelessness." Sugarbaker v. SSM Health Care, 187 F.3d 853, 856 (8th Cir. 1999) (internal quotations omitted). The court should consider all relevant circumstances, particularly the following factors: (1) the possibility of prejudice to the nonmoving party, (2) the length of the delay and the possible impact of that delay on judicial proceedings, (3) the reasons for delay, including whether the delay was within the moving party's reasonable control, and (4) whether the moving party acted in good faith. Id.

Here, plaintiffs filed their motion for attorneys' fees two days after the deadline under Local Rule 54.1(C). It appears that plaintiffs miscalculated the deadline based on their erroneous assumption that they were entitled to three days for mailing under Rule 6(d). Thus, plaintiffs' late filing resulted from inadvertence, mistake, or carelessness. See id. (finding that miscalculation of deadline was due to inadvertence, mistake, or carelessness). Even though plaintiffs' failure to comply with the deadline in Local Rule 54.1(C) was within their control, considering all of the relevant circumstances, their failure constituted excusable neglect. The court's consideration of plaintiffs' untimely motion for attorneys' fees prejudices defendants to the extent that they would have avoided the award of fees mandated by 29 U.S.C. § 216 if the court strictly enforced the 30-day deadline. But in light of the short delay of only two days, the minimal impact of that delay on the proceedings in this case, and the absence of any indication of bad faith on the part of plaintiffs, the court finds

_____

extend under Rule 6(b)(2). See United States ex rel. Greendyke v. CNOS, P.C., No. CIV 04-4105, 2007 WL 2908414 (D.S.D. Sept. 27, 2007).

that plaintiffs' failure resulted from excusable neglect. As a result, the court does not consider plaintiffs' late filing as a waiver of their claim for attorneys' fees and considers the merits of their request.

### B. Entitlement to Attorneys' Fees

Defendants argue that plaintiffs' request for attorneys' fees should be denied because their recovery was "technical" or "de minimis." The FLSA provides for a mandatory award of attorneys' fees when an employer violates 29 U.S.C. § 206. 29 U.S.C. § 216 ("The court . . . **_shall_**, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant." (emphasis added)); see also Fegley v. Higgins, 19 F.3d 1126, 1135 n.9 (6th Cir. 1994) ("It may be worthy of notice that awards of attorney fees under FLSA § 216 are mandatory."). 29 U.S.C. § 216 does not indicate that an employee's eligibility for attorneys' fees depends on the amount he recovered or his success on his other claims (or the employer's counterclaims). Here, the jury found that defendants violated the FLSA by failing to pay Albers and Estes overtime compensation. Thus, an award of reasonable attorneys' fees is mandatory under 29 U.S.C. § 216. The degree of plaintiffs' success on all their claims is critical to the determination of the **_size_** of a reasonable attorneys' fee, not to plaintiffs' **_eligibility_** for a fee award at all. See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 790 (1989) ("Hensley does indicate that the _degree_ of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all.").

In support of their argument that plaintiffs' request for attorneys' fees should be denied, defendants cite a series of cases relating to the issue of whether a party receiving an award of nominal damages in a civil rights case is entitled to recover attorneys' fees under 42 U.S.C. § 1988. See Farrar v. Hobby, 506 U.S. 103 (1992); Piper v. Oliver, 69 F.3d 875 (8th Cir. 1995). In Farrar, 506 U.S. at 112, the Court held that a plaintiff who wins nominal damages is a prevailing party under 42 U.S.C. § 1988. But the "technical" nature of a nominal damages award bears on the propriety of fees awarded under 42 U.S.C. § 1988. Id. at 114. Indeed, "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." Id. at 115. The Eighth Circuit has interpreted Farrar as requiring courts to determine whether, in nominal damages cases, the plaintiff's victory was "merely a technical or pyrrhic one that merits no award of attorney's fees." See Piper, 69 F.3d at 877.

Farrar and its progeny do not bar plaintiffs from recovering attorneys' fees in this case. It is questionable whether the Farrar court's analysis of 42 U.S.C. § 1988, which gives courts discretion to award attorneys' fees in civil rights cases, applies to the determination of attorneys' fees under 29 U.S.C. § 216, which mandates an award of attorneys' fees for violations of the FLSA's overtime provisions. In any case, Farrar only applies to cases where the plaintiff was awarded nominal damages. Here, the jury awarded Albers $1,372.25 in damages and Estes $265.72 in damages, and the court has awarded each plaintiff an additional equal amount in liquidated damages.

These awards, which are clearly more than nominal damages, make plaintiffs prevailing parties for the purposes of the attorneys' fee statute.  See Farrar, 506 U.S. at 113 (explaining that "[a] judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.").  The fact that Albers owes more on an outstanding loan than defendants are obligated to pay in damages for their violation of the FLSA does not negate Albers' status as a "prevailing party."  Indeed, the Supreme Court has explained that if "the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind."  Texas State Teachers Ass'n, 489 U.S. at 791-92 (internal quotation omitted).  Because plaintiffs were awarded more than nominal damages, the court need not determine whether their victory was "merely a technical or pyrrhic one," but rather must determine a reasonable fee, giving due consideration to all of the factors set out in the relevant case law.

### C.      Determination of Reasonable Award

When Congress has authorized an award of attorneys' fees, the court should "determine 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.' " Simpson v. Merchants & Planters Bank, 441 F.3d 572, 580 (8th Cir. 2006) (quoting Hensley, 461 U.S. at 433). The resulting product is called the "lodestar," which is presumed to be the reasonable fee to which counsel is entitled.  McDonald v. Armontrout, 860 F.2d

1456, 1458 (8th Cir. 1988). The court should consider the factors identified in

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.

1974), to set the reasonable number of hours and reasonable hourly rate

components of the fee award formula. Id. at 1459. These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the
> question; (3) the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment by the attorney
> due to acceptance of the case; (5) the customary fee; (6) whether
> the fee is fixed or contingent; (7) time limitations imposed by the
> client or the circumstances; (8) the amount involved and the
> results obtained; (9) the experience, reputation, and ability of the
> attorney; (10) the "undesirability" of the case; (11) the nature and
> length of the professional relationship with the client; and (12)
> awards in similar cases.

Delaware Valley, 478 U.S. at 562 (citing Johnson, 488 F.2d at 717-19); see also

Hensley, 461 U.S. at 430 n.3 (setting out Johnson factors).

After determining the lodestar, "[t]here remain other considerations that

may lead the district court to adjust the fee upward or downward, including the

important factor of the 'results obtained.' " Hensley, 461 U.S. at 434. In

determining whether to adjust the award, the court may also consider the other

Johnson factors, but the "results obtained" factor is particularly important

where the plaintiff succeeded on only some of his claims for relief. Id. at 434

n.9.

### 1. Lodestar

First, the court must determine the number of hours reasonably

expended by plaintiffs' attorneys, and the reasonable hourly rate for their

services.  The court will consider the relevant <u>Johnson</u> factors in making this
determination.

### a.	Time and Labor Required

Plaintiffs request an award of fees for 174.5 hours of work performed by
Attorney Richard D. Casey, 311.5 hours of work performed by Attorney
Ryland L. Deinert, 12.6 hours of work performed by Paralegal Leigh Ann Giedt,
8.5 hours of work performed by Paralegal Valerie A. Winegar, 1.0 hours of work
performed by Paralegal Michelle R. Krier, and 104.1 hours of work performed
by Paralegal Kimberly Wells.  Docket 124-2 at 32.  Defendants object to the
number of hours claimed on several grounds.  First, defendants argue that
time spent with respect to several depositions, plaintiffs' motion for partial
summary judgment on defendants' counterclaims, and plaintiffs' response to
defendants' motion for summary judgment should be excluded because it did
not relate to plaintiffs' FLSA claims.  These objections relate to the results
obtained factor, which the court will consider in the second stage of its
analysis.

Second, defendants object to the time spent on post-trial motions.
Time spent litigating the request for attorneys' fees, including preparation of
the motion and accompanying brief, can be recovered as a component of
plaintiffs' attorneys' fees.  See <u>Jones v. MacMillan Bloedel Containers, Inc., 685</u>
<u>F.2d 236, 239 (8th Cir. 1982)</u>.  Similarly, the court may award attorneys' fees
for time reasonably expended on post-trial motions.  See <u>Washington v. Kroger</u>

Co., 671 F.2d 1072, 1079-80 (8th Cir. 1982) (stating that district court did not abuse discretion in denying additional fee for post-trial proceedings even though appeals court may have allowed an additional fee). Plaintiffs request an award for 34.0 hours spent on post-trial motions. The court finds this time expenditure to be reasonable and does not deduct any hours spend on post-trial motions.

Third, defendants object to the time spent on plaintiffs' bill of costs because plaintiffs withdrew this request after defendants filed objections to it. The court agrees with defendants that the time spent on plaintiffs' bill of costs was unreasonable because the judgment entered on March 13, 2009, clearly stated that neither party was entitled to costs. Plaintiffs now assert that the court's order was erroneous, but they withdrew their bill of costs without objecting to the court's order. It was unreasonable for counsel to spend time preparing a bill of costs in contravention of the court's order. The court deducts 4.6 hours of Attorney Deinert's time[15] and 2.5 hours of Paralegal Winegar's time spent preparing the bill of costs.

---

[15] Attorney Deinert's time entry for March 14, 2009, states, "Taxation of costs; begin motion and brief for attorney fees." Because the court cannot tell how much time Attorney Deinert spent on the taxation of costs versus the brief for attorney fees, the court deducts the entire 4.1 hours requested for that day. The court gave Attorney Deinert credit for the 4.1 hours in determining the total of 34.0 hours requested for work on post-trial motions, so the 4.1 hours is only deducted once.

Fourth, defendants object to time spent on matters that appear to be clerical in nature, including in-house conferences, relaying of telephone messages, and clerical phone calls. Time spent on clerical matters is not properly recoverable, but time spent in in-house conferences is recoverable if reasonably expended. See [Glover v. Johnson, 138 F.3d 229, 254 (6th Cir.1998)](stating that time spent conferring on case with co-counsel is recoverable if reasonably expended). The court excludes 16.3 hours of Paralegal Wells's time[16] and 3.0 hours of Paralegal Winegar's time[17] as clerical. Paralegal Wells and Paralegal Winegar spent these hours preparing the case map and case notes, preparing charts and tables for the clients' file, copying and printing documents, contacting the clerk of courts regarding filing matters, filing documents, organizing for trial, and preparing trial binders. These tasks are clerical or organizational in nature and are not recoverable as part of a

---

[16] The court reduced Paralegal Wells's time by 0.9 hours on September 6, 2006, 1.1 hours on September 15, 2006, 1.3 hours on October 26, 2006, 0.4 hours on October 27, 2006, 0.4 hours on November 6, 2006, 0.3 hours on November 13, 2006, 1.0 hours on November 22, 2006, 0.5 hours on November 27, 2006, 0.1 hours on November 27, 2006, 0.1 hours on December 8, 2006, 0.2 hours on January 9, 2007, 0.4 hours on March 19, 2007, 0.1 hours on April 19, 2007, 1.5 hours on June 8, 2007, 0.2 hours on September 4, 2007, 1.3 hours on March 13, 2008, 0.9 hours on January 22, 2009, 0.9 hours on January 23, 2009, 0.6 hours on February 3, 2009, 1.1 hours on February 5, 2009, 0.8 hours on February 11, 2009, 1.0 hours on February 12, 2009, 0.7 hours on February 17, 2009, 0.3 hours on March 2, 2009, and 0.2 hours on March 3, 2009.

[17] The court reduced Paralegal Winegar's time by 3.0 hours on February 23, 2009.

reasonable attorneys' fee. The court has reviewed the remaining time entries challenged by defendants and finds that the time spent in conferences, discussions, and email correspondence among attorneys and paralegals was reasonable. Thus, the court declines to exclude any additional hours on this ground.

Finally, defendants object to time spent on duplicative efforts. "A court may reduce attorney hours, and consequently fees, for inefficiency or duplication of services in cases where more than one attorney is used." A.J. ex rel. L.B. v. Kierst, 56 F.3d 849, 864 (8th Cir. 1995). Similarly, the court may reduce paralegal hours that are unreasonable or duplicative of other legal fees. Hawkins v. Anheuser-Busch, Inc., 697 F.2d 810, 817 (8th Cir. 1983). The court has reviewed plaintiffs' billing statement and finds that the involvement of both Attorney Casey and Attorney Deinert in the preparation of plaintiffs' complaint, plaintiffs' responses to defendants' counterclaims, the Form 35 report, plaintiffs' Rule 26 initial disclosures, plaintiffs' summary judgment documents, plaintiffs' proposed jury instructions, and plaintiffs' motions in limine was not unreasonable. The time entries indicate that each attorney performed a distinct role in the drafting, review, and revision of these documents, so their work was not duplicative. Likewise, the court finds that Attorney Casey's and Attorney Deinert's attendance at in-house conferences, depositions, and trial was reasonable because each attorney was an active participant in the case at every stage. The court will not reduce Attorney

Casey's or Attorney Deinert's hours as duplicative.  On the other hand, the court has reviewed Paralegal Wells's time entries and finds that her time was duplicative of tasks performed by Attorney Casey and Attorney Deinert on a number of dates and thereby reduces her compensable time by 28.8 hours.[18]

**b.      Experience, Reputation, and Ability of Attorney**

Plaintiffs request that Attorney Casey be compensated at a rate of $230 per hour, that Attorney Deinert be compensated at a rate of $160 an hour, and that the paralegals be compensated at a rate of $70 an hour.  The court finds that a slightly reduced rate of $210 an hour for Attorney Casey is reasonable. This rate takes into account Attorney Casey's substantial experience in employment litigation in federal and state court, the risk he incurred by taking this case on a contingent fee basis, his customary fee range of $210 an hour to $230 an hour, and the level of skill and knowledge required to try this case.

Similarly, the court finds that a slightly reduced rate of $150 an hour for Attorney Deinert is reasonable in this case.  This court recently found that

---

[18] The court reduced Paralegal Wells's time by 0.3 hours on October 17, 2006, 0.2 hours on December 4, 2006, 0.5 hours on February 7, 2007, 0.2 hours on May 22, 2007, 0.2 hours on May 24, 2007, 3.5 hours on September 12, 2007, 0.3 hours on September 18, 2007, 0.1 hours on December 10, 2007, 0.1 hours on January 22, 2008, 0.5 hours on February 4, 2008, 0.1 hours on February 22, 2008, 0.1 hours on April 7, 2008, 0.4 hours on April 29, 2008, 0.3 hours on May 2, 2008, 0.1 hours on July 7, 2008, 0.9 hours on October 27, 2008, 0.7 hours on December 8, 2008, 0.5 hours on February 11, 2009, 0.5 hours on February 20, 2009, 0.5 hours on February 23, 2009, 4.8 hours on February 24, 2009, 4.8 hours on February 25, 2009, 4.6 hours on February 26, 2009, and 4.7 hours on February 27, 2009.

$150 an hour was a reasonable rate for an associate attorney who had completed a one-year judicial clerkship and had recently started private practice when the case began.  See Bishop v. Pennington County, Civ. 06-5066-KES, Docket 97 at 13-14, 2009 WL 1364887, at *6 (D.S.D. May 14, 2009); see also Jadari v. Shiba Inv., Inc., Civ. Nos. 06-5012-RHB, 06-5019-RHB, 06-5020-RHB, 06-5037-RHB, 06-5050-RHB, 2008 WL 5100812, at *7 (D.S.D. Dec. 3, 2008) (finding that $150 per hour was reasonable hourly rate for associate attorneys with judicial clerkship experience).  Here, Attorney Deinert served as a judicial law clerk in the Third Judicial District of Minnesota and had approximately three years of experience in civil litigation at the time plaintiffs filed their motion for attorneys' fees in April of 2009.  Because Attorney Deinert's experience is similar to the experience of the associate attorneys in Bishop and Jadari, the court concludes that $150 an hour is the appropriate hourly rate for Attorney Deinert.  Finally, the court finds that $65 an hour is an appropriate rate for the paralegals.  This rate is consistent with the backgrounds and education of the paralegals, as well as this court's award in previous cases.  See Bishop, Docket 97 at 14, 2009 WL 1364887, at *6 (awarding rate of $65 an hour for work by paralegals).

The court has considered the remaining Johnson factors and finds that, for the purpose of determining the lodestar amount, they do not weigh in favor of increasing or decreasing the number of compensable hours or the hourly

rate for plaintiffs' attorneys.  Thus, the lodestar amount is $87,594, as set forth below:

| Name | Hours | Rate | Total |
|------|------:|------|------:|
| Richard D. Casey | 174.5 | $210 | $36,645 |
| Ryland L. Deinert | 306.9 | $150 | $46,035 |
| Leigh Ann Giedt | 12.6 | $65 | $819 |
| Valerie A. Winegar | 3.0 | $65 | $195 |
| Michelle R. Krier | 1.0 | $65 | $65 |
| Kimberly Wells | 59.0 | $65 | $3,835 |
| TOTAL | 557.1 | | $87,594 |

### 2.    Adjustment

Next the court must determine whether to adjust the fee downward to account for plaintiffs' mixed results in this case.  The "results obtained" factor is "particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief."  Hensley, 461 U.S. at 434. Here, plaintiffs succeeded on only their FLSA claims for relief.  They did not prevail on their § 1981 race discrimination claims or their ERISA claims. Further, the jury did not award plaintiffs the full amount of FLSA damages they requested.  In a situation where plaintiffs did not prevail on all of their claims for relief, the court must determine (1) whether plaintiffs "fail[ed] to prevail on claims that were unrelated to the claims on which [they] succeeded," and (2) whether plaintiffs "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award."  Id.

The first issue requires the court to determine whether plaintiffs' claims were discrete. That is, if plaintiffs' claims were "distinctly different" and "based on different facts and legal theories," then the court cannot award attorneys' fees for services on plaintiffs' unsuccessful claims. Id. at 434-35. But if plaintiffs claims involved a "common core of facts" or were "based on related legal theories," the Supreme Court has recognized that much of counsel's time was devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Id. at 435. In such a case, the court cannot view plaintiffs' lawsuit as a series of discrete claims and should "focus on the significance of the overall relief obtained by the plaintiff[s] in relation to the hours reasonably expended on the litigation." Id. at 435.

Here, the court finds that plaintiffs' race discrimination, ERISA, and FLSA claims were based on a common core of facts because they all arose from the pay and benefits plaintiffs received while they were employees at Tri-State. Plaintiffs alleged that defendants denied them health insurance benefits on the basis of their race, constructively discharged them on the basis of their race (by denying them health insurance benefits), wrongfully denied them access to the employee health insurance and retirement plans, and wrongfully denied them overtime compensation. While these claims are based on distinct legal theories, they all relate to the same basic facts and circumstances about plaintiffs' employment at Tri-State. Thus, it is difficult to view plaintiffs' lawsuit as a series of discrete claims and to divide the hours expended on a

claim-by-claim basis. As a result, the court next addresses the second question, whether plaintiffs achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.

The Supreme Court has provided clear guidance on this question:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . . If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, non-frivolous, and raised in good faith.

Id. at 435-36. Where plaintiffs achieved only partial or limited success, "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Id. at 436.

Here, the court finds that a percentage reduction for plaintiffs' degree of success is appropriate. Plaintiffs brought race discrimination and constructive discharge claims under § 1981, claims under ERISA, and claims for overtime wages under the FLSA. Defendants were granted summary judgment on plaintiffs' constructive discharge and ERISA claims, so plaintiffs were unsuccessful on these claims. And the jury found in favor of defendants and against plaintiffs on plaintiffs' race discrimination claims. The only claim

plaintiffs prevailed on was their FLSA claim, and the jury found that defendants' violation of the FLSA was not willful, thereby limiting Albers' recovery to two years of overtime wages. The jury also awarded plaintiffs half of the overtime damages they requested, indicating that the jury believed that plaintiffs only worked half the overtime hours they claimed they worked. Plaintiffs' success on their claims was only partial, so a reduction for partial success is appropriate. The court cannot identify specific hours relating to plaintiffs' § 1981 or ERISA claims by looking at the hourly statement submitted by plaintiffs, so the court will reduce the lodestar by a percentage to account for plaintiffs' limited success.[19] A reduction in the lodestar amount is also necessary to account for the time plaintiffs spent defending against defendants' counterclaims.

In determining the appropriate percentage reduction, the court considers the difference between plaintiffs' initial settlement demand and the award plaintiffs requested from the jury as compared to the limited damages award by

_____

[19] Plaintiffs assert that they already deducted 37 hours of Attorney Casey's time, 45.2 hours of Attorney Deinert's time, and 22.2 hours of paralegal time that related solely to their § 1981 race discrimination claims. But plaintiffs did not provide the court with a detailed breakdown of the date, time, and specific tasks performed for these hours, so the court cannot determine that the time was reasonably expended and would have been included in the lodestar amount. Further, plaintiffs did not deduct any time spent on the other uncompensable claims (including plaintiffs' ERISA claim and defendants' counterclaims). Finally, the court finds that these hourly reductions do not sufficiently account for plaintiffs' lack of success in this action.

the jury, and the proclamation that in FLSA cases, "[c]ourts should not place an undue emphasis on the amount of the plaintiff's recovery because an award of attorney fees here encourage[s] the vindication of congressionally identified policies and rights." Fegley, 19 F.3d at 1134-35 (internal quotation omitted). The court finds that a 50 percent reduction accounts for the amount of time plaintiffs spent on their successful FLSA claims, their degree of success on this claim, and their degree of success in their lawsuit as a whole. See H.J. Inc. v. Flygt Corp., 925 F.2d 257, 260-61 (8th Cir. 1991) (affirming 50 percent reduction for limited success on the merits). After making this reduction, the court finds that the reasonable attorneys' fee in this case is $43,797 for attorneys' fees plus sales tax of $2,627.82 and awards plaintiffs that amount.

Accordingly, it is hereby

ORDERED that plaintiffs' renewed motion for judgment as a matter of law, or in the alternative, motion for a new trial, and motion to amend or alter the judgment (Docket 120) is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for liquidated damages (Docket 117) is granted in the amount of $1,372.25 in liquidated damages for plaintiff Brendon S. Albers and $265.72 in liquidated damages for plaintiff Christopher Estes.

IT IS FURTHER ORDERED that plaintiffs' motion for attorneys' fees (Docket 123) is granted in the amount of $46,424.82 for attorneys' fees and sales tax.

Dated March 12, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE